**Robert Dale HARRISON,**
**Plaintiff–Appellee,**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, Defendant–Appellant,**

**Board of Health of the Metropolitan Government of Nashville and Davidson County, Defendants.**

No. 94–6042.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 8, 1995.

Decided April 8, 1996.

---

Abby R. Rubenfeld, Nashville, TN, Susan S. Garner (argued and briefed), Turner Law Offices, Nashville, TN, for plaintiff-appellee.

John L. Kennedy (briefed), Stephen Nunn (argued and briefed), The Metropolitan Government of Nashville & Davidson County, Department of Law, Nashville, TN, for defendant-appellant.

Before: LIVELY, KENNEDY, and RYAN, Circuit Judges.

LIVELY, J., delivered the opinion of the court, in which RYAN, J., joined. KENNEDY, J. (pp. 1119–20), delivered a separate opinion concurring in part and dissenting in part.

LIVELY, Circuit Judge.

The defendant, Metropolitan Government of Nashville and Davidson County, Tennessee (Metro), appeals from a judgment of the district court entered on June 14, 1994, finding it in contempt of a 1982 consent decree terminating litigation between the plaintiff, former Metro employee Robert Dale Harrison, and Metro. The district court, which had retained jurisdiction over the case after entering the consent decree, granted Mr. Harrison's motion to reopen the case upon his filing a petition for an adjudication of civil contempt. Following a four-day hearing, the district court found Metro in contempt and ordered it to perform specific affirmative acts in addition to paying the plaintiff for lost earnings. The court also directed Metro to pay all costs and the plaintiff's attorney fees. Upon Metro's posting a supersedeas bond, the district court stayed the money judgment, but refused to stay the injunctive provisions of its decree.

## I.

### A.

The plaintiff, who is black, was hired by Metro in 1972 to work in the Rabies Control Division of the Metropolitan Health Department (the Health Department). The Rabies Control Division is located in the Animal Control Facility (the pound). Mr. Harrison filed an employment discrimination action in district court on June 12, 1980, against Metro, the Board of the Health Department (the Board) and Board members. The plaintiff alleged that the defendants had denied him promotional opportunities on account of his race, and that they had retaliated against him for filing a complaint with the Equal Employment Opportunity Commission (EEOC). At the time of the lawsuit, Mr. Harrison was employed as a Rabies Control Officer I.

Pursuant to an agreement among the parties, the district court entered an Order of Judgment on May 17, 1982 (1982 Judgment or the consent decree), which directed the defendants to reinstate Mr. Harrison at the Rabies Control Officer II level; to calculate his annual leave and sick days as if there had been no break in his employment; and to pay Mr. Harrison $15,000 in back pay and $5,000 in attorney fees, plus costs. The consent decree also contained the following affirmative provisions:

2. The plaintiff shall receive any on-the-job training necessary to perform efficiently in the position [of Rabies Control Officer II] and for promotion to the position of Rabies Control Officer III upon such position becoming available and plaintiff meeting the qualifications therefor.

3. Job seniority will be calculated as if the plaintiff had been on the job with no break in service.

* * *

7. The defendants shall not discriminate against plaintiff or other black persons on account of race, or on account of his complaints against racial discrimination or this lawsuit.

Metro paid Mr. Harrison $20,000 and reinstated him on June 1, 1982, as a Rabies Control Officer II. He was then reclassified in 1989 as a Senior Rabies Control Officer, as were all other employees who formerly held Rabies Control Officer II or III positions.

### B.

Under the applicable civil service rules, the pound was required to enforce a progressive disciplinary policy which provided that an employee would receive a written reprimand for a first infraction of work rules, suspension for a second infraction, demotion for a third infraction and termination for a fourth infraction. With respect to driving accidents, the policy at the pound was to give an oral reprimand for an employee's first accident, a written reprimand for the second, suspension without pay for the third, and to terminate the employee after the fourth. During the plaintiff's employment, and after his reinstatement, a new pound manager, Larry Cole, implemented a policy by which all driving accidents that occurred prior to October 1988 would be "wiped clean" from the employees' records.

In 1989, the plaintiff received an oral reprimand after hitting the rear of another car in a driving accident. He received a written reprimand for colliding into a police car at an intersection in July 1991. In August 1991, Mr. Harrison was suspended for six days without pay after he allegedly encouraged Jeffrey Baker, another rabies control officer, to leave his assigned territory to help him capture stray cats. The defendants claimed that leaving one's territory as well as picking up cats was against pound policy. Mr. Harrison appealed his suspension to the Board under the civil service grievance procedure in May 1992, but apparently to no avail.

The plaintiff had two more driving accidents, one in September 1991 and one in the fall of 1992, the latter of which he allegedly failed to report to his supervisor according to pound practice. At around the same time, Mr. Harrison was involved in two incidents in which he was allegedly rude to customers. Further, on July 30, 1992, the plaintiff received a written reprimand for excessive errors in paperwork.

On July 31, 1992, Paul Botranger, the Director of the Bureau of Environmental Health Services, issued a memorandum to all rabies control personnel regarding errors commonly made on receipts. The defendants had discovered these errors after reviewing all paperwork completed by pound employees between October 29, 1991, and July 27, 1992. On September 28, 1992, Mr. Botranger wrote a memorandum to Dr. Fredia Wadley, the director of the Health Department, indicating that Mr. Harrison continued to make the mistakes pointed out in his July 31 memorandum. Although a number of employees continued to forget to write in the number of days an animal had been impounded, the plaintiff was allegedly the only employee who consistently failed to follow proper procedure in correcting errors on receipts. Mr. Botranger therefore recommended that Mr. Harrison be terminated.

On November 2, 1992, Dr. Wadley informed Mr. Harrison in writing that he was terminated. Initially, the plaintiff was terminated on the grounds that he had been involved in four vehicular accidents, had failed to report his fourth accident to his supervisor, had made excessive paperwork errors and had been rude to the public. However, after Mr. Harrison appealed his dismissal to the Board in February 1993, the Board upheld his dismissal only on the grounds of careless driving and paperwork errors.

Mr. Harrison filed four separate charges with the EEOC after his 1982 reinstatement alleging discrimination and/or retaliation in his employment at the Health Department. In 1992, he also complained either orally or in writing to his supervisor, the director of the Health Department and the mayor of Nashville about how he felt he had been harassed at the pound.

### C.

On December 30, 1993, the plaintiff filed the petition of contempt alleging that Metro, the Board and Board members failed to comply with the 1982 Judgment and ultimately terminated him on account of his race and in retaliation for filing a complaint with the EEOC. On the same day, Mr. Harrison filed a separate federal complaint arising out of the same facts and alleging unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.,* and Tennessee law. The district court consolidated the two cases.

After an evidentiary hearing, the court found that the defendants had paid Mr. Harrison $20,000 and rehired him as a Rabies Control Officer II, but were in contempt because they had "failed to take all reasonable steps to comply" with the order's directives in the areas of training, promotion, seniority and anti-discrimination. Accordingly, the court included affirmative directives in its 1994 judgment similar to those in the 1982 consent decree.

On appeal Metro argues that the district court's findings that the defendants violated the 1982 consent decree by failing to train, failing to promote, failing to grant seniority and pay at the required level, and harassing and discriminating against the plaintiff in disciplining and terminating him are all clearly erroneous. Metro also contends that the district court, in the guise of interpreting the 1982 consent decree, actually rewrote it.

### II.

### A.

In order to hold the defendants in civil contempt, a district court must find that the plaintiff established by clear and convincing evidence that the defendants violated the court's prior order. *Glover v. Johnson,* 934 F.2d 703, 707 (6th Cir.1991) (citing *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir.1987)). In fact, each finding of a violation of the order must be supported by clear and convincing evidence. See *id.* at 710–13. The test for determining a violation is whether the defendants failed to take "all reasonable steps within their power to comply with the court's order." *Peppers v. Barry,* 873 F.2d 967, 969 (6th Cir.1989). We review the district court's finding of civil contempt for an abuse of discretion. *Id.* at 968. A district court may abuse its discretion when it relies on clearly erroneous findings of fact. *Southward v. South Central Ready Mix Supply Corp.,* 7 F.3d 487, 492 (6th Cir.1993) (citation omitted). In examin-

ing findings of fact, this court may reverse only if after a review of all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quotation marks and citation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511–12. We review the district court's interpretation of the consent decree de novo. *Stotts v. Memphis Fire Dep't*, 858 F.2d 289, 299 (6th Cir.1988) (citation omitted).

### B.

With these principles in mind, we now consider each claim of a clearly erroneous finding separately.

### 1. Training

■ The district court found that the defendants had failed to exercise reasonable diligence in complying with the 1982 consent decree because despite the order's training directive, "Mr. Harrison was ... excluded from opportunities to improve his skills and gain training credentials." On appeal, Metro asserts that the training provision of the 1982 Judgment should be construed to require only that it provide the plaintiff with "whatever on-the-job training was normally provided to Rabies Control Officers II and Rabies Control Officers III . . . ." No proof, it says, was ever presented to suggest that any formal training was "necessary" for the positions of Rabies Control Officer II or for promotion to level III.

We do not disagree with Metro's construction of the training requirement. Nevertheless, the district court explicitly found training was indeed offered to other rabies control officers, whether "necessary" or not, while Mr. Harrison was not afforded any such opportunities. Specifically, witnesses testified that at least three white rabies control officers—Victoria Maxwell, Billy Hendrixson and Kenneth Chambers—attended a four- or five-day training session on supervisory skills as well as another training session on animal control. Although the testimony is conflict-

ing, there is also sufficient evidence to show that Mr. Harrison was not offered *any* training after his reinstatement except for euthanasia training from which he was excused and perhaps some private counseling regarding his paperwork mistakes. In fact, the evidence suggests that he and three other black employees were never even apprised of such training opportunities, and that they only heard about such training after-the-fact when employees who had attended discussed the matter. Thus, the district court's finding of a violation of the training provision is not clearly erroneous.

### 2. Promotion

■ Next, the district court found that the defendants failed to promote Mr. Harrison "as directed." Metro contends that the plain language of the 1982 Judgment requires only that the plaintiff be considered for a promotion if and when a Rabies Control Officer III position became available. Metro points out that those employees who were promoted to the position of Rabies Control Officer III were promoted before the 1982 Judgment was in effect. According to Metro, between the date of entry of the consent decree until the level II and III positions were combined in 1989 into the new position of Senior Rabies Control Officer, there were no vacancies in the position of Rabies Control Officer III. Citing *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971) (consent decree must be construed by its express terms since the defendant waived his due process right to litigate the issues in exchange for the decree), Metro argues that the district court's construction of the 1982 Judgment required automatic promotion of Mr. Harrison and therefore erroneously went beyond the four corners of the consent decree. See also *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984).

*Armour* admonishes courts to interpret the scope of a consent decree "within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour*, 402 U.S. at 682, 91 S.Ct. at 1757–58. However, even if we accept Met-

ro's interpretation of the 1982 Judgment, the district court's finding in the area of promotions was not clearly erroneous. In its September 1994 memorandum addressing Metro's motion for stay of judgment, the district court explained that it had "specifically rejected Defendant's argument that Defendant failed to promote Plaintiff as ordered because no promotions to Rabies Control Officer III were available after Plaintiff was reinstated." The court then noted that "it was Defendant's unlawful conduct that resulted in Plaintiff being terminated, and Defendant should not be rewarded for taking actions during Plaintiff's illegal termination which then made it 'impossible' for Defendant to comply with the Court's Order."

We understand the district court to be referring to its belief that the Rabies Control Officer III positions were "filled" by the defendants prior to Mr. Harrison's reinstatement in order to circumvent the promotion provision of the 1982 Judgment. The court's inference can be supported by the record. The record contains evidence of bad faith in that it indicates the defendants denied Mr. Harrison's request for reinstatement as a Rabies Control Officer III in 1982 on the ground that no level III position was available. Yet in that same year, three employees were promoted to the position of Rabies Control Officer III, and two of the three employees who were promoted had less seniority than the plaintiff. Mr. Harrison then formally applied for the position of Rabies Control Officer III in 1984 and 1988, but again was denied, at least once because Metro had not yet "posted a [position for] R.C. Officer III." As the district court found, however, promotional opportunities were disseminated only by word of mouth and were never publicly posted or made known to the plaintiff, despite civil service rules that required such opportunities to be announced and advertised in a manner such that all eligible employees could apply. Finally, the record suggests that the defendants could create positions at will, because Mr. Harrison's position as a Rabies Control Officer II was created especially for his 1982 reinstatement, and because Metro eliminated the title distinctions between level II and level III officers altogether in 1989. This evidence

convinces us that the district court's view that the defendants did not exert the requisite diligence in complying with its order was not clearly erroneous. See *Glover*, 934 F.2d at 708 (citing *Fortin v. Commissioner of Massachusetts Dep't of Pub. Welfare*, 692 F.2d 790, 796–97 (1st Cir.1982), for the proposition that the defendants have the burden of proving impossibility of compliance).

### 3. Seniority

The third directive of the 1982 Judgment states: "Job seniority will be calculated as if the plaintiff had been on the job with no break in service." Metro maintains that the district court abused its discretion because its finding that the defendants violated this provision was not supported by clear and convincing evidence. The district court found that "Mr. Harrison was paid less than all other Senior Officers and was the only Senior Officer to be denied supervisory responsibilities."

Here we agree with Metro. Although the plaintiff was the second most senior employee at the pound and received less pay than the other Senior Rabies Control Officers, the plaintiff presented no evidence that an employee at the pound would necessarily receive higher pay than all employees junior to him. The evidence showed that while longevity pay was based on years of service, step increases in salary were based only on merit. Mr. Harrison did in fact receive the second highest longevity pay of all the pound employees. Although the failure of the plaintiff to start at the same pay step or to progress up the pay scale at the same rate as his colleagues might be evidence of discrimination or retaliation, it does not support a finding that the defendants violated the order with respect to restoring Mr. Harrison's full seniority.

In addition, even though the record demonstrates that Mr. Harrison was denied the supervisory responsibilities given to all other Senior Rabies Control Officers, there is no proof that supervisory duties were a necessary incident to seniority. Since the consent decree at issue does not expressly state that supervisory duties must be given to the

plaintiff, we decline to read such a requirement into the decree. See *Stotts,* 467 U.S. at 574–75, 104 S.Ct. at 2585–86. The district court's finding that the defendants violated the consent decree by failing to "calculate" Mr. Harrison's seniority as directed was therefore clearly erroneous.

### 4. Discrimination

The district court found clear and convincing evidence that the defendants had violated the anti-discrimination provision of the 1982 Judgment on two grounds. First, the court held that Mr. Harrison's supervisor, Mr. Cole, had unlawfully harassed or retaliated against Mr. Harrison and had been "unresponsive to Mr. Harrison's complaints about harassment." Second, the court held that the reasons articulated for firing the plaintiff were pretext for discrimination, pointing to its finding that Mr. Harrison was punished more severely than other employees for his infractions. In this regard, the district court also questioned the legitimacy of Metro's audit for paperwork errors.

Mr. Harrison presented a disparate treatment claim in which there was no direct evidence of discrimination. Thus, we apply the familiar three-part analysis: (1) the plaintiff must establish a prima facie case of racial discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Metro argues that the district court erred because it failed to explicitly employ the *McDonnell Douglas/Burdine* framework of proof in its analysis of the facts at bar. However, even though the district court did not use "magic words," we are satisfied that the court's finding of discriminatory discipline in violation of the consent decree was not clearly erroneous.

▮ A plaintiff may establish a prima facie case of discriminatory discipline by showing that: (1) he belongs to a racial minority; and (2) "for the same or similar conduct, he was treated differently than similarly-situated non-minority employees." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–83 (6th Cir.1992). The Supreme Court has noted that in comparing employment discipline decisions, "precise equivalence in culpability between employees" is not required. *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976). Rather, the plaintiff must simply show that the employees were engaged in misconduct of "comparable seriousness." *Id.; Stotts,* 858 F.2d at 296; *Mitchell,* 964 F.2d at 583 n. 5. The plaintiff must also demonstrate that the non-minority employees to be compared with himself were "similarly-situated *in all respects.*" *Mitchell,* 964 F.2d at 583 (emphasis in original). Accordingly,

> [T]he individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.*

We agree with Metro that the district court improperly compared the discipline the plaintiff received and the discipline meted out to some of the other blundering employees because those employees were not "similarly-situated" with respect to Mr. Harrison. Thus, H.B. Tomlinson, Ed Watkins and Willie Swafford, each identified by the district court as having received more lenient discipline than the plaintiff, were inappropriate comparables. However, the plaintiff's disciplining may be compared with that of any non-minority rabies control officer under the supervision of Mr. Cole. *Mitchell,* 964 F.2d at 583. For comparison of discipline records, the plaintiff identified Robert Rhodes and Troy Kelley as white rabies control officers who also have poor driving records. We look to see whether their infractions were of "comparable seriousness." *Santa Fe Trail,* 427 U.S. at 283 n. 11, 96 S.Ct. at 2580 n. 11.

Mr. Rhodes had twelve motor vehicle accidents in eight years, two of which occurred after the "clean slate" policy was implemented. During Mr. Cole's tenure, Mr. Rhodes was also accused of speeding in a Metro vehicle, and of twice improperly removing a dog from pound property, although there is some dispute over whether the dog incidents occurred during Mr. Cole's administration. For each "type" of infraction—the two driving accidents which occurred after the "clean slate" policy went into effect, the speeding incident and the dog incidents—Mr. Rhodes received no more than a written reprimand.

Mr. Kelley had four motor vehicle accidents. Two of them occurred after the 1988 "clean slate" cut-off date. He was not disciplined for the first of his post–1988 accidents because the pound did not consider him to be at fault, but then received a written reprimand after his last accident because of his involvement in the collision and because of his failure to notify his supervisor of the accident. In February 1991, Mr. Kelley received another written reprimand for confronting animal rights activists in a hostile manner. In October 1992, he received a third written reprimand after he was found to be intoxicated while on duty. In addition, the testimony at the hearing suggested that Mr. Kelley often came to work while intoxicated, that he was arrested during work hours for driving under the influence of alcohol, and that he was allowed to drive Metro vehicles despite the fact that his driver's license had been revoked for a DUI conviction.

In comparison, the plaintiff was involved in four traffic accidents while driving a Metro vehicle between 1989 and 1992. He received traffic tickets as a result of only two out of the four accidents, and both tickets were ultimately dismissed. He maintained that he was not at fault in one of the instances in which he was ticketed because the accident occurred as a result of a faulty traffic light. Further, Mr. Harrison was accused of encouraging another employee to leave his assigned territory to pick up cats, of being rude to members of the public on two occasions, of failing to report his fourth and final accident to his supervisor and of committing too many

paperwork errors. As a defense witness admitted, the progression of discipline for the plaintiff before his termination was as follows: an oral reprimand for his 1989 accident, a written reprimand for his July 1991 accident, and suspension for picking up cats and securing the help of a co-worker not assigned to that territory. He was ultimately terminated on the stated grounds of a combination of his infractions.

The respective conduct of Mr. Rhodes, Mr. Kelley and Mr. Harrison are of comparable seriousness. Each was involved in multiple driving accidents, although Mr. Rhodes and Mr. Kelley fortuitously had only two such accidents after the "clean slate" policy went into effect. Mr. Rhodes and Mr. Kelley were each involved in other sorts of misconduct at least as comparable in seriousness to that of Mr. Harrison, if not more serious, ranging from rudeness to the public to being intoxicated at work. However, Mr. Harrison was treated differently than his co-workers. The defendants apparently treated Mr. Rhodes' and Mr. Kelley's infractions as falling into separate categories such that neither employee ever received more than a written reprimand. Mr. Harrison's infractions, in contrast, were considered cumulatively, evidenced by the fact that he was suspended without pay for the cat incident even though he had never committed a similar infraction. The plaintiff was also treated differently with respect to his termination, since neither Mr. Rhodes nor Mr. Kelley was terminated as a result of their careless driving standing alone, or taken together with their assortment of other offenses. Also, many other rabies control officers made mistakes in paperwork, but none was ever discharged on that ground.

Having established a prima facie case of disparate treatment, the plaintiff raised an inference that his employer more likely than not took its actions based on impermissible factors. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094 (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)). The burden then shifted to the defendants to articulate a legitimate, nondiscriminatory reason for their actions. *Id.* at 253–54, 101 S.Ct. at 1093–94.

Here, the defendants did not offer any reason for suspending Mr. Harrison after his first offense of that particular kind. The presumption of discrimination thus remains, and our inquiry concerning this disciplining is at an end.

■ As to Mr. Harrison's termination, the defendants pointed out that no other employee had a succession of four accidents after 1988, and no other employee made as many errors in paperwork. Since the defendants met their burden of production on the issue of discriminatory discharge, the plaintiff was left with the burden of proving that the defendants' stated reasons for firing him were pretext for discrimination. *Burdine,* 450 U.S. at 253, 256, 101 S.Ct. at 1093–94, 1095; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–10, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). On this point, the district court explicitly found that "Metro's rationale for firing Mr. Harrison [was] pretextual," and we agree. Although Metro relies on its stated discipline policies, the record shows that neither the "clean slate" policy nor the progressive discipline policies were uniformly applied. In a written reprimand for one of Mr. Rhodes' post–1988 accidents, Mr. Cole admonished Mr. Rhodes for his numerous accidents prior to 1988 despite his "clean slate" policy. And although the plaintiff was terminated, in part, as a result of his fourth accident, he was never suspended upon his third accident. No evidence was presented as to whether Mr. Rhodes was ever disciplined for his ten accidents before the "clean slate" policy went into effect, although it is undisputed that prior to that time, the civil service rules would have required termination upon four infractions.

Moreover, the district court "question[ed] the legitimacy of Metro's paperwork audit," which supposedly revealed Mr. Harrison's excessive errors. The court found that the defendants' audit showed that Mr. Harrison made 38 errors in comparison to the 12 errors made by all the other employees combined. However, other evidence supported a finding that all comparable employees, and even Mr. Cole himself, made numerous errors. In fact, a witness for the plaintiff testified that her analysis showed that 99 percent of the receipts written out during the period covered by the defendants' audit contained errors.

Whatever the number may have been, the district court found that the defendants' actions or inaction contributed to Mr. Harrison's paperwork troubles. Mr. Harrison was first assigned to paperwork duty in the office in October 1991 and worked in the office only every fifth week. Furthermore, although the defendants claimed that Mr. Harrison was given adequate training for his office duties, the district court accepted Mr. Harrison's contention that he did not. Thus, the record supports the district court's finding that the reasons given for Mr. Harrison's termination were a pretext for discrimination.

On the basis of this record, we find no clear error in the finding of discriminatory discipline, including termination.

### 5. Harassment and Retaliation

#### a.

■ To determine whether the plaintiff was the victim of racial harassment in violation of the 1982 Judgment, we look to the standards applicable to hostile work environment cases under Title VII law. In *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that for harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. at 2405–06 (quotation marks and citation omitted). The district court relied on relatively few incidents over a rather lengthy period of time to find that the defendants were guilty of harassing the plaintiff in the work setting. Metro argues that some of the incidents had no racial connotations, or were not directed at Mr. Harrison. Metro's principal contention with respect to harassment, however, is that the incidents were too few and isolated to support a finding of racial harassment.

■ As reprehensible as the incidents of alleged harassment may have been, we do not find that they constituted an unreasonably abusive environment. See *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th

Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989). One element required for proof of sexual harassment is that the alleged harassment "had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment. . . ." *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). In *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 485 (6th Cir.1989), relying on *Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989), we determined that the elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment.

Here, the record reveals that Mr. Harrison testified at the hearing that Mr. Cole's statements, including Mr. Cole's use of a racial epithet, affected him such that he "couldn't hardly think a lot during the day," and had "sleepless and restless nights." Mr. Harrison also testified that he was "rather shocked" in response to a Ku Klux Klan hood incident at work and that it caused him "a lot of stress." Further, the district court observed that a physician who had diagnosed Mr. Harrison as having stress-related situational insomnia stated that Mr. Harrison worked "under a great deal of stress with a manager who is trying to run him off of a job." However, the plaintiff has failed to present evidence that his work performance was affected by the racial hostility, even if only in his own opinion. We conclude that the finding of harassment was therefore clearly erroneous.

### b.

■ The 1964 Civil Rights Act protects an employee who has "opposed any practice made an unlawful employment practice" by Title VII or who has made a charge under the statutory scheme. 42 U.S.C. § 2000e–3(a) (1988). Like a disparate treatment claim, proof of a retaliation claim under federal employment discrimination law is governed by the *McDonnell Douglas/Burdine* tripartite framework of shifting burdens of production and proof. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987). A prima facie retaliation claim is established by showing the following: "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Wrenn*, 808 F.2d at 500; see also *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990); compare *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987) (following the approach in *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982), which subsumes the element of employer knowledge into the causal connection analysis).

Here, Mr. Harrison has engaged in numerous protected activities known to Metro officials and Metro has clearly taken adverse employment actions against him. Mr. Harrison filed suit against Metro in 1980, resulting in the 1982 Judgment. The parties stipulated that since May 1982, Mr. Harrison filed four charges of discrimination with the EEOC regarding discrimination in his employment at the Health Department. He also wrote a memorandum to Mr. Cole complaining of harassment by Mr. Cole, and sent a copy of this memorandum to the director of the Health Department.

■ Metro contends, however, that there is no causal relationship between the protected activities and the adverse employment actions imposed upon the plaintiff. Specifically, Metro asserts that Mr. Harrison's suspension in August 1991 and his termination in November 1992 were too far removed from the EEOC complaints he filed in 1986 and 1987 to be causally related.

The Tenth Circuit's decision in *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982), cited with approval by this court, has looked to the temporal proximity of the adverse action to the protected activity to determine whether there is a "causal connection." See *Wrenn*,

808 F.2d at 501. Here, the plaintiff filed an EEOC charge at some point after his August 1991 suspension and was thereafter discharged. At most, one year and three months elapsed between his filing of a charge and his termination. In addition, the evidence showed that three employees feared retaliation because they testified at Mr. Harrison's hearing, and that Mr. Cole made repeated comments that suggested he would not hesitate to run employees out of his department. This evidence, taken together with the timetable of Mr. Harrison's EEOC charge and termination, convinces us that the plaintiff established a prima facie case of retaliation.

More important, however, is the fact that study of the record in this case reveals an atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees, both black and white, and that the defendants took every opportunity to make his life as an employee unpleasant. Although the evidence does not support a finding of racial harassment, we conclude that it does support a finding a retaliation. Given our earlier approval of the district court's finding that the defendants' proffered reasons for terminating the plaintiff were pretextual, the district court's finding of retaliation was not clearly erroneous.

### CONCLUSION

■ Although we have found two of the district court's findings clearly erroneous, we are not required to set aside the finding of contempt. See *Glover,* 934 F.2d at 717. The judge who entered the 1982 consent decree was the same judge who found the defendants in contempt of the injunctive portions of that decree. Judge Nixon's interpretation of his own order is "entitled to great deference." *Kendrick v. Bland,* 931 F.2d 421, 423 (6th Cir.1991). See also *Huguley v. General Motors Corp.,* 999 F.2d 142, 146 (6th Cir. 1993) ("[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it.") (quoting *Brown v. Neeb,* 644 F.2d 551, 558 n. 12 (6th Cir.1981)).

Furthermore, there is evidence that Metro did not consider the consent decree to be very important. Remarkably, both Mr. Cole, who was the plaintiff's direct supervisor, and Dr. Wadley, who actually terminated the plaintiff, testified that although they knew of Mr. Harrison's EEOC filings, they knew nothing of the existence of the consent decree. Mr. Cole testified that no one at Metro informed him there was a consent decree in effect. Dr. Wadley testified that she knew of the plaintiff's EEOC filings but did not know that Metro was under a court order to train Mr. Harrison properly and not to discriminate against him. The district court did not abuse its discretion in finding the defendants in contempt.

The judgment of the district court is **AFFIRMED** in part and **REVERSED** in part. The case is **REMANDED** to the district court for its determination of whether our partial reversal requires any changes in remedy.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority opinion except parts II(B)(2) and II(B)(4).

First, in part II(B)(2), the court affirms the District Court's finding that Metro had violated the 1982 consent judgment by failing to promote plaintiff to Rabies Control Officer III. Defendant argued that no promotions to Rabies Control Officer III were available after plaintiff's reinstatement. In its order denying defendant's motion for stay of judgment, the District Court stated "it was Defendant's unlawful conduct that resulted in Plaintiff being terminated, and Defendant should not be rewarded for taking actions during Plaintiff's illegal termination which then made it 'impossible' for Defendant to comply with the Court's Order."

These promotions—one of someone with more seniority and the other two, one black and one white—were made before entry of the consent judgment, a judgment entered without any finding that the termination was

illegal but by consent without any admission of liability.[1]

The relevant portion of the Order, of which Metro had been found in contempt, orders Metro to

> B. Provide Mr. Harrison with any on-the-job training necessary to perform efficiently in the position and for promotion to the position of Rabies Control Officer III upon such position becoming available and Mr. Harrison meeting the qualifications therefor.

This provision does not entitle Mr. Harrison to a promotion; it conditions such a promotion on a Rabies Control Officer III position becoming available and Mr. Harrison being found to hold the requisite qualifications. Indeed, if Harrison had the qualifications for that office, there would be no need to give him the training. Thus, to the extent the District Court found this provision entitled Mr. Harrison to a promotion, it was in error.

Moreover, the District Court made no factual findings that Metro somehow violated this provision of the Order by promoting white employees immediately before the Order took effect. In the section of its opinion entitled "Factual Findings," the District Court merely noted that "[t]wo employees with less seniority than Mr. Harrison ... were promoted to Rabies Control Officer III positions." There is no acknowledgement that these promotions occurred before the consent decree was signed. Likewise, in its "Conclusion of Law" section, the District Court wrote: "Mr. Harrison ... was never promoted to a Rabies Officer III position. Notably, employees junior to Mr. Harrison served in the position of Rabies Control Officer III...."

There is no legal or factual basis to find that Metro violated the consent judgment by these earlier promotions. Since the District Court gave no remedy for the failure to promote plaintiff to Rabies Officer III except to continue the requirement that plaintiff be trained for future promotions, the court's

error might be found to be harmless. However, to the extent that it may have included its erroneous conclusion regarding these prior promotions in resolving other issues and particularly the issue of pretext, I would require the District Court to reconsider that issue anew on remand.

Second, while I agree with the majority that there is evidence to support the District Court's finding of discrimination in defendant's treatment of plaintiff's paper errors, and therefore in his firing, I cannot agree that the District Court was entitled to compare plaintiff's treatment under the clean slate policy with the treatment of persons with accidents before the clean slate policy unless there is some claim—which there is not—that the adoption of the clean slate policy was discriminatory.

Plaintiff's driving infractions occurred after the introduction of the clean slate policy. He was not, therefore, similarly situated in all respects. Under the policy, he could be fired for four accidents. Under the policy, Mr. Rhodes could not be fired. His earlier accidents were wiped clean. Thus, while the court was entitled to compare the treatment of Rhodes with respect to other infractions versus the treatment of plaintiff's errors, it was not, in my opinion, entitled to compare the driving infractions.

I would set aside the above findings and remand for further consideration by the District Court.

---

**1.** There is no claim and no indication in the record that plaintiff was unaware of those promotions at the time he settled his earlier discharge case and entered into the consent judgment. These contempt proceedings were brought more than ten years after the 1982 consent judgment.