J.L. SPOONS, INC., et al., Plaintiffs,

v.

Maureen O'CONNOR, Director, et al., Defendants.

No. 1:98CV2857.

United States District Court, N.D. Ohio, Eastern Division.

Dec. 28, 1999.

J. Michael Murray, Steven D. Shafron, Jeremy A. Rosenbaum, Berkman, Gordon, Murray & DeVan, Cleveland, OH, for plaintiffs.

Chester T. Lyman, Jr., Office of the Attorney General, David A. Raber, Office of the Attorney General, Business & Government Regulation, Columbus, OH, for defendants.

*MEMORANDUM AND ORDER*

ALDRICH, District Judge.

The plaintiffs bring this action to challenge the constitutionality of the current version of Ohio Administrative Code 4301:1–1–52 ("Rule 52"). After a hearing, this Court issued a temporary restraining order ("TRO") prohibiting the defendants from enforcing Rule 52 against the plaintiffs. The TRO was extended for an additional ten days; thereafter, the defendants agreed not to enforce Rule 52 against the plaintiffs until this Court ruled on the plaintiffs' motion for a preliminary injunction. A preliminary injunction hearing was held on April 15, 1999. Between April and July of 1999, the parties gathered and submitted evidence pertinent to the preliminary injunction motion. The defendants also filed a motion to disqualify the plaintiffs' expert witness or, in the alternative, to strike the witness' testimony. For the reasons that follow, this Court denies the defendants' motion to strike (doc. # 38), grants the plaintiffs' motion for a preliminary injunction (doc. # 5), and preliminarily enjoins the defendants from enforcing the following portions of Rule 52 against the plaintiffs: §§ (A)(1), (A)(3), (B)(1) (in part), (B)(2), (B)(3), and (B)(7).[1]

## I. Facts and Procedural History

This action comes on the heels of a prior case in which this Court invalidated an old version of Rule 52 on overbreadth grounds. *See J.L. Spoons, Inc., v. City of Brunswick,* 181 F.R.D. 354 (N.D.Ohio 1998). After this Court concluded that the old Rule 52 violated the First Amendment, the Ohio Liquor Control Commission (OLCC) rescinded that version of the law and promulgated a new Rule 52.[2] On December 10, 1998—the date the new version went into effect—the plaintiffs sought a TRO to prevent the defendants from enforcing the new Rule 52 (hereinafter simply "Rule 52"). After a hearing in which all parties were represented, this Court found that the plaintiffs satisfied the requirements for a TRO, and, accordingly, temporarily enjoined the defendants from enforcing particular sections of Rule 52 against the plaintiffs.

---

1. Because the parties did not indicate that it was appropriate to consolidate the preliminary injunction hearing with the trial on the merits, this Court did not order the trial to be advanced and consolidated in accordance with Federal Rule of Civil Procedure 65(a)(2). Further, as discussed below with respect to § (B)(1) of Rule 52, this Court preliminarily enjoins enforcement of § (B)(1) only to the extent it prohibits "lewd activities." This Court neither addresses nor enjoins the prohibition of "disorderly activities" in that section.

2. Although state agents had considered revising Rule 52 prior to this Court's invalidation of it, promulgation of the new rule was prompted in large part by this Court's June 15, 1998 ruling. *See* Defendants' Response to Show Cause Order, Exh. B, at 3 (hearing on new rule "comes about as a result of [this Court's] decision on June 15th of 1998 declaring the [old] Rule 52 ... to be unconstitutional"). The prior case and the instant action are related, and this Court takes note of the record in the previous case to the extent that it is relevant to the issues presented here.

The plaintiffs—J.L. Spoons, Inc., Cleveland's P.M. on the Boardwalk, Ltd., and Entertainment U.S.A. of Cleveland, Inc.—operate cabarets which feature live performances by female dancers who, in the course of their performances, appear topless and in G-strings. The plaintiffs also hold permits from the state of Ohio to dispense alcoholic beverages in these cabarets. Under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201–02, they have sued the Ohio Department of Public Safety ("ODPS") and its director, Maureen O'Connor,[3] to prevent these defendants from enforcing the following sections of Rule 52:

4301:1–1–52 ENTERTAINMENT— PROHIBITION AGAINST IMPROPER CONDUCT

(A) DEFINITIONS AS USED IN THIS RULE:

(1) "LEWD ACTIVITIES" ARE THOSE ACTIVITIES (INCLUDING THOSE WHICH ARE ELECTRONICALLY REPRODUCED) THAT CONTAIN LUSTFUL, LASCIVIOUS OR LECHEROUS BEHAVIOR AND INCLUDES, BUT IS NOT LIMITED TO ACTS OF, OR ACTS THAT SIMULATE, SEXUAL INTERCOURSE, MASTURBATION, SODOMY, BESTIALITY, OR ORAL COPULATION.

. . .

(3) "NUDITY" IS THE SHOWING (INCLUDING ELECTRONICALLY SHOWING) OF THE HUMAN MALE OR FEMALE GENITALS, PUBIC AREA OR BUTTOCKS (OR ANUS) WITH LESS THAN A FULLY OPAQUE COVERING, THE SHOWING OF THE FEMALE BREAST WITH LESS THAN A FULLY OPAQUE COVERING OF ANY PART OF THE NIPPLE AND/OR AREOLA, OR THE SHOWING OF THE COVERED MALE GENITALS IN A DISCERNIBLY TURGID STATE.

(B) PROHIBITED ACTIVITIES: NO PERMIT HOLDER, HIS AGENT, OR EMPLOYEE SHALL KNOWINGLY OR WILLFULLY ALLOW IN AND UPON HIS LICENSED PERMIT PREMISES ANY PERSONS TO:

(1) ENGAGE IN ANY LEWD ... ACTIVITIES;

(2) APPEAR IN A STATE OF NUDITY;

(3) TOUCH, FONDLE, OR CARESS THE GENITALS, PUBIC AREA, BUTTOCKS, OR FEMALE BREASTS OF ANY PERSON;

. . .

(7) COMMIT IMPROPER CONDUCT OF ANY KIND, TYPE, OR CHARACTER THAT WOULD OFFEND THE PUBLIC'S SENSE OF DECENCY, SOBRIETY OR GOOD ORDER.

Ohio Admin.Code § 4301:1–1–52 (1998) (capitalization in original).

The cabaret operators argue that Rule 52 is a content-based restriction upon their freedom of expression, and, moreover, that Rule 52 is unconstitutionally overbroad and vague on its face. O'Connor and ODPS dispute these allegations and argue that Rule 52 validly regulates conduct rather than speech. After issuing the TRO and considering briefs filed on behalf of the parties, this Court ordered the defendants to show cause as to why the challenged portions of Rule 52 should not be preliminarily enjoined. The defendants submitted a memorandum and evidentiary material in response, and asked that a hearing be conducted on the plaintiffs' motion for a preliminary injunction. At the time a hearing was scheduled, the defendants moved for additional time in which to file a response to the complaint. This Court granted that request, and, subsequently, the defendants filed a motion to dismiss the case. Because this Court concluded that the case presents a justiciable controversy, and that the complaint states a claim against appropriate parties upon which relief can be granted, this Court denied the defendants' motion to dismiss.

Thereafter, on April 15, 1999, a preliminary injunction hearing was conducted. The

**3.** At the time the plaintiffs filed this lawsuit, Mitchell Brown was the director of ODPS. In April of 1999, this Court granted the defendants' request to substitute Maureen O'Connor, the new ODPS director, as the named party defendant.

plaintiffs submitted deposition testimony from Judith Hanna, a cultural anthropologist, and Rosemary Vinci, a former dancer and marketing director for one of the plaintiffs' cabarets. Hanna, who specializes in the study of dance and other performing arts, testified that exotic dancers communicate an artistic message of "adult play," eroticism, and bodily beauty. Hanna Depo., 5/26/99, at 9–11. Like Hanna, Vinci described the plush atmosphere in the plaintiffs' clubs, and testified that prohibitions on nudity and touching one's own body would "stifle" the messages conveyed by the dancers. Vinci Depo., 6/1/99, at 11–13. The plaintiffs also submitted an affidavit from Christy Wright, an employee of Entertainment U.S.A. of Cleveland, Inc. Wright had called numerous theaters and entertainment venues in the Cleveland area, and learned that these venues permit patrons to consume alcohol in performance areas.

The defendants presented testimony from the Deputy Director of ODPS as well as an enforcement agent for ODPS. The Deputy Director testified that there are between 24,000 and 26,000 liquor permit holders in Ohio. He further stated that although ODPS agents receive training on how to enforce Rule 52, they have some discretion in deciding whether it is appropriate to cite an establishment for a violation of the rule. Agent Torrens testified that he recently had visited a number of "gentlemen's clubs" in southwestern Ohio to determine whether they were in violation of the law. The dancers in those establishments had performed both stage and table dances, removing articles of clothing and receiving tips as they danced. Torrens admitted that the dancers had conveyed an "erotic message." Although Torrens did not issue any citations in the course of this undercover investigation, he averred that the activities he had witnessed constitute violations of §§ (B)(1), (B)(2), and (B)(3) of Rule 52. He further stated that he did not know whether those activities violated § (B)(7).

The defendants filed a motion to disqualify Hanna as an expert witness or, in the alternative, to strike her testimony. The plaintiffs opposed that motion. In addition, the parties have informed the Court that they have submitted all materials pertinent to the preliminary injunction motion.

## II. Motion to Strike

■ O'Connor and ODPS move to strike Hanna's expert testimony on the grounds that it lacks foundation and is unreliable under Federal Rule of Evidence 702 and Supreme Court case law. The cabaret operators, on the other hand, argue that Hanna's credentials in the field of dance are undisputed, and that this Court accepted her testimony in the previous lawsuit.

This Court agrees with the plaintiffs. Hanna possesses a doctorate in anthropology from Columbia University and has been studying the cultural underpinnings of dance for almost twenty years. Hanna Depo., at 5–6. She has authored approximately eighty-seven peer-reviewed articles and six books on the subject of dance. Id. at 6. As a social scientist, Hanna has visited the plaintiffs' cabarets on a number of occasions, and has observed the activities in at least fifty-two cabarets across the country. Id. at 43. Contrary to the defendants' assertions, Hanna has not limited her observations to "upscale" cabarets; rather, she has visited a range of erotic dance clubs. Id. at 45. The fact that she has focused on gentlemen's clubs, and has visited only a handful of places in Ohio,[4] pertains more to the *weight* to attach to her testimony than to the admissibility of the testimony in the first place. This Court concludes that Hanna possesses specialized knowledge that is at least somewhat helpful in this case, and that her testimony is sufficiently reliable to be admissible.

## III. Motion for Preliminary Injunction

■ In deciding whether to grant a preliminary injunction, a district court must consider and balance four factors: (1) whether

---

4. The defendants are incorrect to the extent they claim Hanna "declined an invitation" to study a fourth cabaret in Ohio. Hanna's deposition reveals that she declined an invitation to testify on behalf of the City of Cincinnati because she could

not support Cincinnati's argument in the particular case at issue. While the defendants describe Hanna as biased, it is evident that Hanna's analyses would not support the arguments of a city seeking to curtail erotic dancing.

the plaintiffs have established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiffs; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999). In cases involving the First Amendment, the crucial inquiry is usually whether the plaintiffs have demonstrated a substantial likelihood of success on the merits. *Id.* This is so because the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute. *Id.*

## A. Substantial Likelihood of Success on the Merits

The cabaret operators argue that Rule 52 is unconstitutional both on its face and as applied. Each of these arguments will be discussed in turn.[5]

### 1. Application of Rule 52 to plaintiffs

■ The plaintiffs, through their dancers and patrons, enjoy · "a degree of First Amendment protection" in presenting non-obscene, erotic dancing at their cabarets. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 581, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J., concurring). Although the First Amendment protects erotic dance that is enhanced by nudity, such expressive activity falls "within the outer perimeters of the First Amendment," *id.* at 566, 111 S.Ct. 2456, and is generally afforded less protection than, for example, pure political speech.[6]

The plaintiffs argue that Rule 52 constitutes a content-based restriction upon their right to present a non-obscene, artistic message. They point to use of the word "entertainment" in the rule's title to substantiate their claim that Rule 52 is directed at the content of expression. The state, on the other hand, argues that the rule is a content-neutral mechanism for regulating the harmful effects of certain conduct in combination with alcohol consumption. Viewing the language of Rule 52 as a whole, the regulation cannot be properly described as a content-based restriction upon speech.[7] Although use of the word "entertainment" underscores the nature of the First Amendment interests that are at stake, Rule 52 applies to all of the approximately 25,000 liquor permit holders in Ohio—including retail sellers who offer no "entertainment" at all. As a liquor regulation having an incidental effect on freedom of speech, Rule 52 is best treated as a content-neutral, "time, place, or manner" restriction upon First Amendment activities. *See id.; see also Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir.1998) (adult entertainment regulations are usually treated as content neutral).

■ Such content-neutral restrictions are analyzed under the four-part test enunciated in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under this test, the regulation must (1) be within the government's constitutional power; (2) further an important or substantial governmental interest; (3) be justified by an interest unrelated to the suppression of free expression; and (4) ensure that the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 376–77, 88 S.Ct. 1673; *Barnes*, 501 U.S. at 567, 111 S.Ct. 2456. Moreover, application of a law like Rule 52 to cabarets that provide erotic danc-

---

**5.** This Court already has decided that the plaintiffs have standing to challenge Rule 52 both as applied and on overbreadth grounds. *See* Order Denying Motion to Dismiss, Doc. # 24, at 5–7.

**6.** The defendants fail to recognize that the performances presented at the plaintiffs' clubs are constitutionally protected expression. Although such expression is of a "lesser magnitude than the interest in untrammeled political debate," it is still protected by the First Amendment. *Barnes*, 501 U.S. at 584, 111 S.Ct. 2456 (Souter,

J., concurring) (quotation and citation omitted). Moreover, while Rule 52 is primarily concerned with "conduct," the regulation nonetheless directly impacts the plaintiffs' rights to freedom of speech.

**7.** Although the plaintiffs do not attack the sections in Rule 52 pertaining to "disorderly activities," drug use, stolen property, or the transfer of food stamps and other benefits, the existence of those sections supports a finding that Rule 52 is a content-neutral regulation.

ing must be based on the state's "substantial interest in combating the secondary effects of adult entertainment establishments." *Barnes*, 501 U.S. at 582, 111 S.Ct. 2456 (Souter, J., concurring); *see also Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 134 (6th Cir.1994) (Justice Souter's concurrence in *Barnes* is based on narrowest grounds and is therefore binding opinion.[8]

Applying this analysis to the case at bar, there is no dispute that promulgation of Rule 52 is within the State of Ohio's police powers. *See Barnes*, 501 U.S. at 567, 111 S.Ct. 2456. States have inherent power to regulate harmful conduct; moreover, that power is neither dependent on nor augmented by the Twenty–First Amendment. The Supreme Court specifically "has recognized that the States' inherent police powers provide ample authority to restrict the kind of 'bacchanalian revelries' described in the *LaRue* opinion *regardless* of whether alcoholic beverages are involved." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 515, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (emphasis added) (disavowing the reasoning in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), that the Twenty–First Amendment conferred a presumption of validity upon such regulations). Further, this Court rejects the defendants' argument that because "the selling of liquor within the State of Ohio is a privilege and not a right," the State "may therefore place restrictions on ... conduct in a place where liquor is sold." The Supreme Court has made abundantly clear that state benefits may not be "conditioned on the surrender of a constitutional right." *44 Liquormart*, 517 U.S. at 513, 116 S.Ct. 1495.

With respect to the second and third prongs of the *O'Brien* test, O'Connor and

ODPS claim that Ohio is concerned with the "harmful secondary effects of sexually oriented or adult businesses." Although the defendants have not defined those effects, they submitted the transcript of a public hearing on the promulgation of Rule 52 showing that OLCC commissioners at least considered such things as increased crime rates in areas surrounding sexually-oriented businesses. There is no evidence of increased crime in the locations of the plaintiffs' businesses,[9] but "legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, [and a state] could reasonably conclude that forbidding nude entertainment ... furthers its interest in preventing prostitution, sexual assault, and associated crimes." *Barnes*, 501 U.S. at 584, 111 S.Ct. 2456 (Souter, J., concurring). This interest has been found to be both substantial and unrelated to the freedom of expression. *Id.* at 582–86, 111 S.Ct. 2456 (Souter, J., concurring). In light of *Barnes*, then, Rule 52 satisfies the second and third requirements of *O'Brien* insofar as it applies to the plaintiffs' cabarets.

The fourth *O'Brien* condition, that the incidental restriction upon freedom of expression be no greater than essential, is satisfied so long as the regulation is "narrowly tailored." *Id.* at 572, 111 S.Ct. 2456. That is, Rule 52 must promote Ohio's interest in curbing harmful secondary effects, and may not result in a burden on speech that is substantially broader than necessary to achieve the State's goal. *See Threesome Entertainment v. Strittmather*, 4 F.Supp.2d 710, 720–21 (N.D.Ohio 1998) (O'Malley, J.).

The plaintiffs fail to demonstrate a substantial likelihood of success on the fourth prong of *O'Brien* except for the prohibitions

---

8. The United States Supreme Court may be reassessing the *Barnes* framework this term in *City of Erie v. Pap's A.M.*, No. 98–1161, a Supremacy Clause case implicating the applicability of *Barnes*. At the current time, this Court is bound by the Sixth Circuit's determination that Justice Souter's concurrence in *Barnes* constitutes the controlling opinion in that case.

9. Indeed, there is no reliable evidence that harmful secondary effects are associated with any businesses in Ohio similar to the plaintiffs' establishments. Although the defendants' failure to proffer such evidence gives this Court pause, the

binding opinion in *Barnes* makes clear that the State is not required to affirmatively produce this evidence. *Barnes*, 501 U.S. at 584–85, 111 S.Ct. 2456 (Souter, J., concurring); *see also Triplett Grille*, 40 F.3d at 135 (no burden on governmental entity to produce such evidence). And, while the State's authority to regulate alcohol does not underlie the State's substantial interest in curbing negative secondary effects, it is not wholly unreasonable for Ohio to conclude that such effects are more likely to occur where alcohol is served.

contained in § (B)(7). First, §§ (A)(1) and (B)(1) work together to prohibit the plaintiffs from allowing their dancers and patrons to engage in, or simulate, "lewd" sex acts. There can be little doubt that prohibiting live sex acts only minimally burdens the plaintiffs' ability to communicate their message of eroticism. The "but is not limited to" and "simulate" language in § (A)(1) would be problematic if an over-zealous enforcement officer decided, for example, that a dancer's rubbing of a pole qualifies as the simulation of a sex act; however, there is little evidence in the record that ODPS would employ such an expansive and burdensome reading of §§ (A)(1) and (B)(1). Absent such evidence, the cabaret operators cannot succeed on their as-applied challenge to §§ (A)(1) and (B)(1).[10] Further, the plaintiffs have not demonstrated that the "electronically reproduced" language in § (A)(1) violates their First Amendment rights. Although the plaintiffs allege in their complaint that they have televisions in their clubs, there is no evidence in the record regarding the types of "electronically reproduced" activities that they show on those monitors. Thus, the cabaret operators have failed to demonstrate a substantial likelihood of success on their claim that §§ (A)(1) and (B)(1) are unconstitutional as applied to them.

Similarly, §§ (A)(3) and (B)(2) work together to prohibit the cabaret owners from allowing their performers to appear without wearing what are commonly known as pasties and G-strings. As the Supreme Court has reasoned, "[d]ropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Barnes,* 501 U.S. at 587, 111 S.Ct. 2456 (Souter, J., concurring). In addition, as with § (A)(1), there is no evidence that the plaintiffs present anything on their televisions other than the kind of expression that

they offer live. Thus, the parenthetical language in (A)(3) regarding the "electronic showing" of nudity has not been demonstrated to be unconstitutional as applied to these plaintiffs. Under the fourth *O'Brien* factor, the plaintiffs have failed to demonstrate that §§ (A)(3) and (B)(2) are not narrowly tailored to the State's interests.

Section (B)(3) presents a closer question, as it prevents permit holders from allowing dancers to touch, fondle, or caress specified areas "of any person"—including, technically, their own persons. Although prohibiting such intentional contact between dancers and patrons is narrowly tailored to the State's interest, preventing dancers from touching their own breasts or buttocks impinges more directly on their ability to convey their message. However, in light of the fact that § (B)(3) is designed to prohibit intentional, overtly sexual contact, this Court is not convinced that the plaintiffs are likely to succeed on their as-applied challenge to § (B)(3). As with the prohibition on simulating sex acts in §§ (A)(1) and (B)(1), the record is devoid of credible evidence that the defendants will use § (B)(3) to ban the type of dancing that occurs at the plaintiffs' cabarets. Accordingly, the plaintiffs have not demonstrated that § (B)(3) fails the fourth requirement of *O'Brien.*

The same cannot be said for § (B)(7), which goes well beyond what is necessary to further Ohio's interest in combating the secondary effects of sexually-oriented businesses. This broad, open-ended prohibition on "improper conduct" could easily be used to curtail the plaintiffs' constitutionally protected activities. There is nothing in Rule 52 to prevent State agents from selectively deciding that dancers, whose activities violate no other section of the rule, nonetheless "offend the public's sense of decency, sobriety, or good order." Indeed, even Agent Torrens

---

10. This Court attaches little weight to the portion of Hanna's testimony in which she opined that the prohibition on "simulation" of sex acts would obliterate the erotic dance industry. Hanna based this conclusion on the assumption that ODPS would interpret virtually all erotic dancing as involving the "simulation" of "lewd activities." This assumption is not supported by the record. Unquestionably, the First Amendment

prohibits the defendants from applying Rule 52 in a way that would eradicate erotic dancing. For example, this Court viewed the videotapes the defendants submitted, and appreciates that most, if not all, of the activities depicted therein are constitutionally protected. Absent evidence that O'Connor and ODPS cite cabarets under §§ (A)(1) and (B)(1) for such activities, the plaintiffs cannot prevail on their as-applied challenge.

testified that he did not know the circumstances under which it would be appropriate to cite an establishment for a violation of § (B)(7). As this provision restricts First Amendment freedoms to a degree more than is essential under the fourth prong of the *O'Brien* test, § (B)(7) is unconstitutional as applied to the plaintiffs.

In sum, the cabaret operators have shown a substantial likelihood of success on their claim that § (B)(7) is unconstitutional as applied to them. They have not, however, demonstrated that the remaining sections of Rule 52 are unconstitutional as applied.

## 2. Facial Challenge

The plaintiffs' facial challenge is a very different matter. In their facial attack, the cabaret operators argue that Rule 52 is impermissibly overbroad and vague. This Court finds it probable that the plaintiffs will prevail on their argument that the challenged sections are overbroad, and that § (B)(7) is vague as well as overbroad.

 A government regulation is facially overbroad when there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). To be unconstitutionally overbroad, a regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The plaintiffs' overbreadth challenge is controlled by the Sixth Circuit's decision in *Triplett Grille*. In that case, the Sixth Circuit invalidated on overbreadth grounds an Akron ordinance that prohibited public displays of nudity and sexual conduct. *See Triplett Grille*, 40 F.3d at 135–36. The court reasoned as follows:

> The Akron public indecency ordinance at issue here prohibits all public nudity, including live performances with serious literary, artistic, or political value. The ordinance makes no attempt to regulate only

those expressive activities associated with harmful secondary effects and includes no limiting provisions. Instead, Akron's wide ban on public nudity sweeps within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes.

*Id.* at 136. The Sixth Circuit noted that in *Barnes,* when indicating that there was no overbreadth claim before the Supreme Court, Justice Souter had observed that "[i]t is difficult to see ... how the enforcement of Indiana's statute against nudity in a production of 'Hair' and 'Equus' somewhere other than an 'adult' theater would further the State's interest in avoiding harmful secondary effects...." *Barnes,* 501 U.S. at 585, n. 2, 111 S.Ct. 2456 (Souter, J., concurring); *Triplett Grille,* 40 F.3d at 136. Because the Akron ordinance in *Triplett Grille* covered artistic performances as well as adult entertainment, the Sixth Circuit found the ordinance to be overbroad in violation of the First Amendment. *Triplett Grille,* 40 F.3d at 135–36.

While the current Rule 52 is considerably more tailored than its predecessor version, the regulation still sweeps in a substantial amount of protected expression. With respect to §§ (A)(1) and (B)(1), the most glaring problem is that these sections prohibit the showing of "electronically reproduced" images containing actual or simulated sexual activities. The plaintiffs contend, and the defendants do not dispute, that the prohibition on electronic displays includes televisions, movie theaters, and computers. Thus, §§ (A)(1) and (B)(1) prohibit an Internet café with a liquor license from allowing its customers to view "lustful, lascivious or lecherous behavior" via computers—even though it is now established that use of the Internet enjoys full protection under the First Amendment. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 2344, 138 L.Ed.2d 874 (1997) (no basis for qualifying the level of scrutiny applied to the Internet). Moreover, any bar that has a television set risks violating §§ (A)(1) and (B)(1) if it chooses to air Home Box Office or late night television on the monitor.

The second major flaw with §§ (A)(1) and (B)(1) is that these sections prohibit the "simulation" of a variety of sexual behavior. Rule 52 does not define "simulate," and there is no binding judicial decision, administrative construction, or well-established practice to provide a limiting construction in this case. *See City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (any limiting construction must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice"). Indeed, it would be difficult to limit the term "simulate" when § (A)(1) specifically states that prohibited behavior "includes, *but is not limited to* acts of, or acts that simulate...." Ohio Admin.Code 4301:1–1–52, § (A)(1) (emphasis added). The ban on simulation even applies to individuals who are fully clothed. Hence, on its face, § (A)(1) (in conjunction with § (B)(1)) sweeps in any artistic performance containing simulated sexual behavior—including such mainstream hits as "Miss Saigon" and "Rent"—that occurs in a theater, comedy club, supper club, musical venue, or other forum with a liquor license.

Although O'Connor and ODPS assert that the performance areas and the liquor permit areas are often separate in such venues, the cabaret operators have submitted compelling evidence to the contrary. Christy Wright, an employee of Entertainment U.S.A. of Cleveland, Inc., contacted many of the major entertainment venues in Cleveland and learned that they permit audience members to consume alcohol while viewing performances. *See* Plaintiff's Exh. 3. Moreover, because of the prohibition on "electronically reproduced" activities, a movie theater with a liquor license may violate §§ (A)(1) and (B)(1) every time it shows a "Rated R" film. Based on the foregoing, the plaintiffs have demonstrated a strong likelihood of success on their claim that the ban on lewd activities in § (B)(1), in conjunction with § (A)(1), impermissibly curtails a substantial amount of protected speech. *See Triplett Grille,* 40 F.3d at 135–36; *Farkas v. Miller,* 151 F.3d 900, 905 (8th Cir.1998) (statute's explicit exception for theaters, concert halls and the like "saves it from being overbroad").

■ The prohibition on appearing in a state of nudity contained in §§ (A)(3) and (B)(2) is unconstitutionally overbroad for similar reasons. A variety of artistic performances, including the oft-cited "Hair" and "Equus" as well as smaller productions like Karen Finley's one-woman shows, are constitutionally protected and involve nudity. Yet Rule 52 makes no exception for such artistic performances. When a regulation sweeps in performances that fall outside the rubric of adult entertainment, the regulation is vulnerable to an overbreadth attack. *See Farkas,* 151 F.3d at 905; *Triplett Grille,* 40 F.3d at 135–36. In fact, the only difference between Rule 52's ban on nudity and the ordinance declared to be overbroad in *Triplett Grille* is that Rule 52 is limited to venues with liquor licenses. While Rule 52 does not amount to a total ban on public nudity, a ban does not need to be total to be substantially overbroad. The relevant question is whether the regulation "reaches a substantial amount of constitutionally protected conduct," such that the regulation threatens to chill the exercise of protected expressive activity. *City of Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *see also United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 361 (6th Cir.1998). The plaintiffs in this case have demonstrated that §§ (A)(3) and (B)(2) reach a substantial amount of protected conduct.[11]

This conclusion is especially apparent when one considers that, like § (A)(1), § (A)(3) prohibits "electronically showing" nudity. That is, § (A)(3) prevents a cinema with a liquor license from showing films containing nudity, and prevents a bar with a

---

**11.** Considering the prevalence of liquor permits, and the dearth of evidence that harmful secondary effects are associated with anything other than adult entertainment businesses, there is no reason to force theaters, comedy clubs, and similar establishments to choose between possessing liquor permits or presenting performances that might fall within the proscriptions of Rule 52. The fact that "Hair" may be presented at a venue without a liquor permit is of limited significance when the plaintiffs have shown that, in fact, many major entertainment venues possess liquor permits that include performance areas.

television set from tuning into "NYPD Blue." [12] The defendants have not argued, let alone demonstrated, that such activities are associated with any harmful secondary effects. *See Triplett Grille,* 40 F.3d at 136 (city's failure to present evidence linking serious entertainment with harmful secondary effects resulted in overbroad ordinance). As discussed previously regarding the plaintiffs' as-applied challenge, Ohio may prevent erotic dancers from appearing totally nude; however, in so doing, Ohio may not curtail a substantial amount of protected expression outside the realm of adult entertainment. *Id.* Moreover, courts cannot assume that government officials will apply a regulation in a constitutional manner. *See Southwest Ohio Reg'l Transit Auth.,* 163 F.3d at 359. In this case, the Deputy Director of ODPS admitted that a production of "Old Calcutta" had been cited for violating the prior version of Rule 52. In light of the foregoing, the plaintiffs have demonstrated a substantial likelihood of success on their claim that §§ (A)(3) and (B)(2) are unconstitutionally overbroad.

The cabaret operators have also shown a probability of success on their claim that § (B)(3) is overbroad. While it does not appear that this section's ban on fondling or caressing certain anatomical areas reaches a substantial amount of protected expression, the section's ban on touching does sweep in a variety of expressive activity. First, § (B)(3) covers ballet and modern dance performances in which dancers frequently are required, for example, to "touch" the clothed buttocks of other dancers. Second, the defendants admit that, because the ban on touching includes not touching oneself, § (B)(3) would prevent Michael Jackson from engaging in his famous groin-grabbing dance move.[13] As previously noted, there is no

basis in the record for imposing a limiting construction on the language in Rule 52.

Section (B)(7) requires little discussion. Its prohibition on committing "improper conduct of any kind ... that would offend the public's sense of decency" is broad, amorphous, and suffers from the same infirmities as the old version of Rule 52. *See J.L. Spoons, Inc. v. City of Brunswick,* 181 F.R.D. 354 (N.D.Ohio 1998). The testimony from Agent Torrens reveals that there are no standards to guide the defendants' discretion in enforcing § (B)(7). Accordingly, the plaintiffs have shown that § (B)(7) is likely to sweep in a substantial amount of protected expression.

█ Finally, the cabaret operators argue that the challenged sections of Rule 52 are unconstitutionally vague on their face. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined" such that a person of ordinary intelligence cannot readily identify whether the enactment proscribes particular conduct. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Vague laws are offensive because they lend themselves to "arbitrary and discriminatory enforcement" and, in the First Amendment context, operate to inhibit the exercise of free speech. *Id.* at 108–09, 92 S.Ct. 2294. "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *Southwest Ohio Reg'l Transit Auth.,* 163 F.3d at 359 (citation omitted).

Based on the foregoing standard, the plaintiffs are substantially likely to prevail on the merits of their claim that § (B)(7) is

---

**12.** Rule 52's prohibition on "electronic" images is one important way in which this case differs from *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). In addition, the record in *LaRue* was far different from the record in this case, including the absence of evidence that the *LaRue* regulation applied to theaters and venues outside the realm of adult entertainment. *See id.* at 114, 93 S.Ct. 390.

**13.** At the preliminary injunction hearing, this Court noted that professional baseball players violate § (B)(3)—and, arguably, § (B)(1)—every time they readjust their jockstraps. The plaintiffs further noted that hotels are licensed permit premises under Rule 52, and, therefore, that Rule 52 applies to the activities that occur in hotel rooms. While such conduct typically does not involve speech for purposes of the First Amendment, these examples highlight the wide scope of Rule 52.

unconstitutionally vague. Section (B)(7) lacks standards to guide the discretion of public officials; in addition, persons of ordinary intelligence must guess at the section's meaning and could reasonably differ as to its application. *See Grayned*, 408 U.S. at 109, 92 S.Ct. 2294.

The other challenged sections of Rule 52 are not so vague that persons of ordinary intelligence cannot readily identify whether their conduct falls within the rule's proscriptions. The meaning of "lewd activities," "nudity," and "touch, fondle, or caress" are sufficiently clear. Although the meaning of "simulate" in § (A)(1) is somewhat open to debate, the word is not so amorphous as to render the section unconstitutionally vague. Moreover, while ODPS trains its agents regarding the applicability of §§ (A)(1), (A)(3), (B)(1), (B)(2), and (B)(3), ODPS agents do not have defined standards for enforcing § (B)(7). Regulatory language need not be mathematically precise; it need only be sufficiently clear that ordinary persons can discern the standard for inclusion and exclusion. *Id.* at 110, 92 S.Ct. 2294; *Southwest Ohio Reg'l Transit Auth.*, 163 F.3d at 359.

In sum, the cabaret operators have demonstrated a strong likelihood of success on their claim that the challenged sections of Rule 52 are facially overbroad. With respect to their facial vagueness challenge, they have demonstrated a substantial likelihood that only § (B)(7) is unconstitutionally vague.

## B. Threat of Irreparable Harm to the Plaintiff

■ As explained above, the plaintiffs are substantially likely to prevail on their overbreadth challenge, and on their claims that § (B)(7) is unconstitutional both as applied and under the vagueness doctrine. The denial of constitutional rights has been held by numerous federal courts, including the Supreme Court, to constitute irreparable harm. Specifically, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It follows, as a matter of law, that the plaintiffs will suffer irreparable harm if O'Connor and

ODPS are not enjoined from enforcing the challenged sections of Rule 52.

## C. Threat of Substantial Harm to the Defendants

This Court does not find that the defendants will suffer any appreciable amount of harm if they are enjoined from enforcing the pertinent sections of Rule 52 against the plaintiffs. Therefore, the third factor considered regarding the issuance of a preliminary injunction favors the plaintiffs.

## D. Whether Injunctive Relief would Serve the Public Interest

Finally, it is in the public interest to prevent the enforcement of unconstitutional laws, and thereby uphold constitutional rights. Therefore, the fourth factor this Court must balance supports the issuance of a preliminary injunction.

## E. Scope of Preliminary Injunction

■ This Court finds that it is not possible to sever the language that the plaintiffs have demonstrated to likely be unconstitutional from the sections in which the language is contained. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 202 (6th Cir.1997), *cert. denied*, 523 U.S. 1036, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998) (under Ohio law, severance may not fundamentally disrupt the statutory scheme or require the insertion of additional words). For example, this Court may not remove the "simulate" language in § (A)(1) without altering the intentions of the rule's drafters. However, it is appropriate to limit the injunction on enforcing § (B)(1) to that section's ban on "lewd" activities without encompassing the section's ban on "disorderly activities." Sections (A)(1) and (A)(2), respectively, define "lewd activities" and "disorderly activities" separately. In addition, although the language within a particular section may not be severable from the section itself, the entire section may be severable from the remainder of the regulation. *See id.* (consider whether unconstitutional portions stand by themselves). Thus, this Court may enjoin §§ (A)(1), (A)(3), (B)(1) (as it pertains to lewd activities), (B)(2), (B)(3), and (B)(7) without altering the

meaning of, or otherwise disrupting, the remaining portions of Rule 52.

### IV. Conclusion

For the foregoing reasons, this Court denies the defendants' motion to strike, grants the plaintiffs' motion for a preliminary injunction, and enjoins the defendants from enforcing §§ (A)(1), (A)(3), (B)(1) (as it pertains to lewd activities), (B)(2), (B)(3), and (B)(7) of Rule 52 against the plaintiffs in this lawsuit and their officers, agents, and employees.

A status call is scheduled on January 31, 2000 at 3:00 p.m., in Chambers, 3402 Key Tower, for the purpose of determining whether any additional proceedings are necessary to reach a final decision on the merits.

IT IS SO ORDERED.