**J.L. SPOONS, INC., et al., Plaintiffs,**

v.

**Kenneth MORCKEL, et al., Defendants.**

**Nos. 1:98CV2857, 1:04CV0314.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 1, 2004.

J. Michael Murray, Berkman, Gordon, Murray & DeVan, Raymond V. Vasvari, Jr., Berkman Gordon Murray & Devan, Steven D. Shafron, Berkman, Gordon, Murray & DeVan, Cleveland, OH, for J.L. Spoons, Inc., dba Christie's Cabaret of Brunswick Entertainment U.S.A. of Cleveland, Inc., dba Christie's Cabaret of Cleveland SSY, Inc., dba Christie's Cabaret of Youngstown Buckeye Association of Club Executives, Plaintiffs.

Charles E. Febus, Office of the Attorney General, Elise W. Porter, Office of the Attorney General, State of Ohio, Anthony D. Siciliano, Office of the Attorney General, Columbus, OH, for Kenneth Morckel, in his official capacity as Director, Ohio Department of Public Safety, Ohio Department of Public Safety, Rocco J. Colonna, in his official capacity as a member of the Ohio Liquor Control Commission, Keith McNamara, in his official capacity as Chairman of the Ohio Liquor Control Commission, Janet Cohen Howard, in her official capacity as a member of the Ohio Liquor Control Commission, Ohio Liquor Control Commission, Defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This action represents the latest challenge to a series of efforts by the State of Ohio and its agents to craft regulations limiting the display of nudity and sexual behavior in liquor-serving establishments. This Court has previously invalidated portions of Ohio Administrative Code § 4301:1–1–52 ("Rule 52") as unconstitutional. *See J.L. Spoons, Inc. v. City of Brunswick,* 181 F.R.D. 354 (N.D.Ohio 1998)("*Spoons I* "); *J.L. Spoons, Inc. v. O'Connor,* 190 F.R.D. 433 (N.D.Ohio 1999)(granting preliminary injunction)("*Spoons II* ") and *J.L. Spoons, Inc. v. O'Connor,* 194 F.R.D. 589 (N.D.Ohio 2000)(converting preliminary injunction into permanent injunction)("*Spoons III* "). Plaintiffs bring this action to challenge the constitutionality of a newly-enacted version of Rule 52.

Plaintiffs in this case include J.L. Spoons, Inc., Entertainment USA, and SSY, Inc., holders of state-issued permits for the on-premises consumption of alcohol and operators of upscale "gentleman's clubs," each of whom, according to the Complaint in Case No. 04CV314, "present[s] artistic and choreographed non-obscene dance performances to its patrons by women who, in the course of their performances, appear topless and/or in g-strings and/or nude." Also appearing as a plaintiff is the Buckeye Association of Club Executives ("BACE"), a nonprofit organization created to represent the interests of similar club owners. These parties will be hereinafter referred to as "the club owners."

On February 18, 2004, this Court granted the club owners' request for a temporary restraining order, finding (following a hearing on the matter) that the enactment, adoption, and threatened enforcement of Rule 52 carried the potential to cause them irreparable harm (Docket No. 12). On March 18, 2004, with the agreement of the parties, the Court mandated that this order remain in force until April 1, 2004.

Now before the Court are two matters: the club owners' motion for a preliminary injunction (Docket No. 9 in Case No. 04CV314), and their motion for an order to show cause why defendants should not be held in contempt (Docket No. 68 in Case No. 98CV2857). On March 11 and March 12, 2004, the Court heard testimony from several witnesses, and argument from the parties, on each of these matters.

For the following reasons, this Court enjoins the defendants from enforcing Sections (A)(2), (B)(2), and (B)(3) of Rule 52, and denies the plaintiffs' motion for an order to show cause why defendants should not be held in contempt.

## I. Facts and Procedural History

The Court last considered these issues on July 5, 2000, when it permanently enjoined the enforcement of sections (A)(1), (A)(3), (B)(1) (in part), (B)(2), (B)(3), and (B)(7) of Rule 52, finding them invalid under the First and Fourteenth Amendments to the United States Constitution. *Spoons III.* In response to this decision, the Ohio Liquor Control Commission (together with its individual members, the Ohio Department of Public Safety, and Director Kenneth Morckel, hereinafter "the State") commenced proceedings for the enactment of a new version of Rule 52[1].

On September 11, 2003, a public hearing was conducted before the Ohio Liquor Control Commission, at which the Commissioners took documents into evidence and heard testimony from four witnesses on the subject of the potential validity and effectiveness of proposed new language for Rule 52[2]. At this hearing, Mark Anderson, Executive Director of the Ohio Liquor Control Commission, testified that the prior version of Rule 52 had been rescinded, and that all filing requirements set forth by the Ohio Revised Code had been met with regard to the new version of the Rule.

Witnesses for the public at the September 11 hearing included David Raber, a former assistant attorney general who testified regarding sections of Rule 52 not at issue in this case, and Ed Duvall of the Ohio Department of Public Safety, who testified that his agents "anxiously await a clear and concise set of guidelines ... on what is acceptable contact, conduct, in a bar." Transcript of Official Hearing, Appendix 1 to Docket No. 18, Case No. 04CV314 ("Transcript"), at 69.

The bulk of the testimony heard by the Commission was provided by attorney Bruce A. Taylor of Fairfax, Virginia. Mr. Taylor introduced himself as "an attorney with a background in prosecuting a lot of different vice crimes, including obscenity and prostitution and some liquor violations," Transcript at 11, and then spoke at length about his understanding of precedent in this area of the law, and his impression of the potential reach of liquor regulations under the United States Constitution. In Mr. Taylor's opinion, "nude dancing does contribute to its own types of secondary effects and to a greater degree than other liquor bars that don't have nude dancing." Transcript at 18. Mr. Taylor continued:

> The amount of prostitution, the amount of drug traffic, the amount of fights and brawls that occur in and around bars or juice bars that have nude dancing is an escalated statistical number, and it's not sort of an uncommon or unreasonable result to imagine, because sexual performances tend to excite sexual thoughts and feelings in men who are the predominant customers of these kinds of places.
>
> It is the purpose of the business to excite the male customers into giving up their money to the dancers. That's the

---

**1.** At the March 11 Hearing, counsel for the State contended that the proceedings were commenced pursuant to a "five-year mandatory rule review." The impetus for commencement is not crucial to the Court's decision in this matter.

**2.** Counsel for the State explained at the March 11 Hearing that the new language was drafted by an assistant Ohio attorney general.

whole purpose of having girls—and young girls, you don't see anybody who is our mother or wife or, you know, grown-up women don't dance in these places; these are for young girls to dance to either young men or older men or middle-aged guys, and it's designed to cause sexual excitement, and that sexually charged atmosphere then contributes to some of the other harms and crimes that we see in the statistics[.]

Transcript at 18–19. As a result of the link between nude dancing and adverse secondary effects thus postulated, Mr. Taylor expressed his opinion that the language under consideration by the Commission would be held constitutional. In fact, Mr. Taylor believed that the Commission would do well to enact

a rule ... that would put into place regulations on liquor permit holders in Ohio that was [sic] in existence throughout the '60s and '70s and '80s, which is, that if you're going to have a liquor permit in Ohio, your girls are going to have to wear what amounts to a bikini top.

Transcript at 48.

Following an additional period for comment and consideration [3], the new version of Rule 52 was finalized and filed on February 9, 2004. Rule 52, including new prohibitions on "nudity" and "sexual activity," was scheduled to take effect on February 20, 2004.

The club owners brought this suit after learning of plans "for enforcement agents ... to investigate adult nightclubs in Cleveland, Columbus, Toledo, and Dayton, all on Friday, February 20, 2004" and to issue citations for violations of Rule 52 at that time. Declaration of Greg Flaig, publisher of *Ohio Night Dreams*, Appendix 1 to Docket No. 1, Case No. 04CV314, at 2.

The club owners claim that the new sections of Rule 52 concerning "nudity" and "sexual activity" are at least as broadly restrictive of protected expression as those held unconstitutional by this Court in 2000. They seek a declaratory judgment that these sections are unconstitutional, and a permanent injunction against their enforcement.

After granting the club owners' request for a temporary restraining order, this Court scheduled a preliminary injunction hearing for March 11 and 12, 2004.[4] At

---

**3.** The Liquor Control Commission rejected requests by the Ohio Licensed Beverage Association and the BACE to delay for 90 days its forwarding of new Rule 52 to the Joint Committee on Agency Rule Review. The delay had been requested to allow review of the proposed language by these organizations and their legal counsel. Defendants' Exhibits B, F, and G.

On October 3, 2003, the Commission announced its intent, at the behest of the Joint Committee for Agency Rule Review, to re-file new Rule 52. Input was solicited from counsel for the plaintiffs, among others, at an informal meeting held in Columbus on October 16, 2003. Additionally, exhibits submitted by the State reveal the Commission's solicitation of new input on Rule 52 from the Ohio Association of Chiefs of Police, the Ohio Municipal League, the Ohio Prosecuting At-

torneys Association, the County Commissioners' Association of Ohio, the Ohio Township Association, the Buckeye State Sheriffs' Association, and a group called Citizens for Community Values. Defendants' Exhibit Y.

While the State did not submit any evidence of changes proposed by these groups, the record does disclose the Commission's rejection of alterations removing certain of the prohibitions on nudity and sexual contact suggested by the Ohio Licensed Beverage Association. Defendants' Exhibit A.

**4.** At the same hearing, counsel for both parties agreed to present their arguments on the propriety of a contempt sanction, as requested by the club owners in Case No. 98CV2857. Therefore, no separate hearing is required for the Court to resolve that issue.

that hearing, counsel submitted evidence and presented their arguments to the Court regarding the constitutionality of Rule 52.

The club owners called Dr. Judith Hanna, Ph.D., a cultural anthropologist and sociologist who researches and writes extensively on dance, arts, and society. Dr. Hanna discussed her experience attending and studying clubs such as those run by the plaintiffs,[5] and testified on the artistic value of exotic and erotic dance and the array of potential messages conveyed by the performance of dancers at such establishments. Dr. Hanna also discussed a variety of mainstream ballet, modern dance, and theater performances which involve the types of nudity and sexual contact prohibited by Rule 52.

The club owners also presented testimony by Dr. Daniel G. Linz, Ph.D., a sociologist and psychologist who specializes in the field of law and society. Dr. Linz presented the results of numerous peer-reviewed studies undertaken by him (in conjunction with several colleagues), which attempt to gauge the impact of the presence of adult cabarets on the "adverse secondary effects" claimed by the State as a rationale for its enactment of Rule 52. Dr. Linz reviewed the methodology employed by experts in this area, including the errors common to previous reports. He then described how his studies, conducted in Indiana, Florida, North Carolina, and each of four Ohio cities (Toledo, Columbus, Cleveland, and Dayton), showed no positive correlation, and in some instances a *negative* correlation, between the presence of liquor-serving establishments featuring nude or semi-nude dancing and the types of crime cited by the State.

In support of Rule 52, the State presented testimony by Scott Pohlman of the Ohio Department of Public Safety. Mr. Pohlman described the types of illicit behavior he has personally observed as an enforcement agent entering liquor-serving establishments which feature nude or semi-nude dancing, and offered his opinion as to the need for a provision like Rule 52 in order to limit these types of behavior. Finally, the State called Mark Anderson, Executive Director of the Liquor Control Commission, who testified as to the procedural steps undertaken in filing new Rule 52, and the intentions of the Commission in enacting and enforcing the Rule.

Following this evidentiary hearing, the State agreed to refrain from any enforcement of Rule 52 until at least April 1, 2004, in order to grant the Court sufficient time to enter a ruling on the club owners' motion for a preliminary injunction.

## II. Discussion

The club owners challenge sections (A)(2), (B)(2), and (B)(3) of new Rule 52, which read as follows:

(A) Definitions as used in this rule:

(2) "Nudity" means the showing of the human male or female genital, pubic area or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple and/or areola; the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft, perineum, anal region, or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of the nipples and/or areola.

---

**5.** This Court has previously noted Dr. Hanna's broad base of experience with studying the cultural underpinnings of dance, and her particular specialized knowledge in the area of exotic and erotic dance. *See Spoons II,* 190 F.R.D. at 437.

(B) Prohibited activities: no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to:

 (2) Appear in a state of nudity; [6]

 (3) Engage·in sexual activity as said term is defined in ORC Chapter 2907; [7]

The Ohio Revised Code defines "sexual activity" as:

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" is defined as: any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." [8]

---

**6.** Section (B)(2) is limited only by section (B)(8), which states that the prohibition on nudity "shall not apply to any individual exposing a breast in the process of breastfeeding an infant under two years of age."

**7.** The club owners do not challenge sections (A)(1) and (B)(1) of Rule 52, which deal with limiting "disorderly activities;" nor do they challenge sections (B)(5) through (B)(7), which cover drugs, theft, and improper use of food stamps and other state benefits.

Nor do the club owners challenge section (B)(4) of Rule 52: "no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to [c]ommit Public Indecency, as said term is defined in ORC Chapter 2907." (ORC Chapter 2907 defines "public indecency" as:

recklessly do[ing] any of the following, under circumstances in which [one's] conduct is likely to be viewed by and affront others, not members of his or her household:

 (1) Expose his or her private parts, or engage in masturbation;

 (2) Engage in sexual conduct;

 (3) Engage in conduct that to an ordinary observer would appear to be sexual conduct or masturbation.)

This is presumably because the club owners are not in reasonable apprehension of prosecution under section (B)(4). Patrons of the establishments owned by plaintiffs are, by nature and by definition, not likely to be affronted by the nudity on display there. The sections of Rule 52 at issue here do not contain any similar requirement that viewers be affronted to trigger their enforcement.

**8.** The Court previously invalidated, as unconstitutional, the following portions of Rule 52:

(A) Definitions as used in this rule:

 (1) "Lewd activities" are those activities (including those which are electronically reproduced) that contain lustful, lascivious or lecherous behavior and includes, but is not limited to acts of, or acts that simulate, sexual intercourse, masturbation, sodomy, bestiality, or oral copulation.

 .   .   .   .   .

 (3) "Nudity" is the showing (including electronically showing) of the human male or female genitals, pubic area or buttocks (or anus) with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple and/or areola, or the showing of the covered male genitals in a discernibly turgid state.

(B) Prohibited activities: no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to:

 (1) engage in any lewd ... activities;

 (2) appear in a state of nudity;

 (3) touch, fondle, or caress the genitals, pubic area, buttocks, or female breasts of any person;

 .   .   .   .   .

 (7) commit improper conduct of any kind, type, or character that would offend the public's sense of decency, sobriety or good order.

Ohio Admin. Code 4301:1–1–52 (1998).

As in the previous action, the club owners contend that these provisions are unconstitutional under the First and Fourteenth Amendments to the United States Constitution, both as applied to the plaintiffs' establishments, and facially (as impermissibly overbroad)[9]. As in the previous action, the club owners seek an injunction against the enforcement of the challenged provisions. The club owners also seek a finding of contempt against the State, for violation of this Court's previous order invalidating portions of Rule 52.

## A. The Motion for a Preliminary Injunction

In deciding whether to grant a preliminary injunction,

a district court must give consideration to four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. Federal Rule of Civil Procedure 52(c) requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue.

*ACLU v. McCreary County*, 354 F.3d 438, 445 (6th Cir.2003), citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998), *In re DeLorean Co.*, 755 F.2d 1223, 1228 (6th Cir.1985). In cases involving the First Amendment, the crucial inquiry is usually whether the plaintiffs have demonstrated a substantial likelihood of success on the merits. This is so because the issues of the public interest and harm to the respec-

tive parties largely depend on the constitutionality of the statute. *Id., citing Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998), *cert. denied*, 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999).

### 1. Substantial Likelihood of Success on the Merits

### a. The As–Applied Challenge

The club owners first claim that the challenged sections of Rule 52 represent an impermissible violation of their right to freedom of speech and expression under the First Amendment.

The constitutional landscape in this area remains marred by the Supreme Court's inability to reach consensus, and the fragmentary opinions this creates. Once again, both parties to this dispute must rely extensively on the principle that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of the five Justices, the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." *Triplett Grille v. City of Akron*, 40 F.3d 129, 132 (1994), quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

Yet this guidance does not always guarantee consistent results. For example, while the Sixth Circuit has ruled Justice Souter's opinion in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), to be the narrowest, and thus controlling, *see Spoons II*, 190 F.R.D. 433, 439 n. 8, the Pennsylvania Supreme Court apparently found that "aside from the agreement by a majority of the *Barnes* Court that nude dancing is entitled to some First Amendment protec-

---

9. As in the previous action, the plaintiffs have standing to bring these claims. *See* Case No. 98CV2857, Docket No. 24, at 5–7.

tion, we can find no point on which a majority of the *Barnes* Court agreed." *City of Erie, et al. v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), quoting *Pap's A.M. v. City of Erie*, 553 Pa. 348, 358, 719 A.2d 273 (Pa.1998).

With this caveat in mind, two recent Supreme Court decisions bear noting. The first, *City of Erie*, was specifically considered by this Court in a prior decision. *See Spoons III*, 194 F.R.D. at 592. The Court adheres to its prior assessment that the decision in *City of Erie* is thoroughly consistent with Justice Souter's opinion in *Barnes*. The second case, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), has been decided since our last examination of these issues. The Court agrees with the parties that Justice Kennedy's opinion in that case is controlling under the rule of *Marks v. United States*.

■ There is no dispute about the protected status of nude dancing under the First Amendment. The plaintiffs, through their dancers and patrons, enjoy "a degree of First Amendment protection" in presenting non-obscene, erotic dancing at their cabarets. *Barnes*, 501 U.S. at 581, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). The First Amendment protects erotic dance that is enhanced by nudity, though such expressive activity falls "within the outer perimeters of the First Amendment," *id.* at 566, 111 S.Ct. 2456, and is generally afforded less protection than, for example, pure political speech. While Rule 52 is primarily concerned with regulating conduct, it nonetheless impacts the club owners' rights to free speech.

There appears to be no claim that the new version of Rule 52 is a content-based restriction on speech. Instead, the parties argue the as-applied challenge within the framework laid out by *City of Erie* and Justice Souter's opinion in *Barnes*. *Cf. Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir.1998) (adult entertainment regulations are usually treated as content neutral).

■ This framework, in turn, relies heavily on the four-part test announced in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under the *O'Brien* test, a constitutional regulation must (1) be within the government's constitutional power; (2) further an important or substantial governmental interest; (3) be justified by an interest unrelated to the suppression of free expression; and (4) ensure that the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 376–77, 88 S.Ct. 1673; *Barnes*, 501 U.S. at 567, 111 S.Ct. 2456.

■ Application of Rule 52 to establishments that provide erotic dancing must be based on the state's "substantial interest in combating the secondary effects of adult entertainment establishments." *Barnes*, 501 U.S. at 582, 111 S.Ct. 2456; *see also Triplett Grille*, 40 F.3d at 134. The ruling in *City of Erie*, which dealt exclusively with an as-applied challenge, reaffirmed the power of states to regulate expressive behavior in order to combat "the secondary effects [of such behavior], such as the impacts on public health, safety, and welfare." 529 U.S. at 291, 120 S.Ct. 1382, citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In *Alameda Books*, Justice Kennedy addressed (within the zoning context) the volume of evidence necessary to justify a regulation based on secondary effects.

Evaluation of the as-applied challenge to Rule 52 must therefore rest largely on the *O'Brien* test and Justice Kennedy's opinion in *Alameda Books*.

To begin with the *O'Brien* test: It remains clear that promulgation of Rule 52 is

within the State of Ohio's police power. *See Barnes,* 501 U.S. at 567, 111 S.Ct. 2456. States have the inherent power to regulate harmful conduct; this power is not diminished by a state's decision to exercise it via the mechanism of liquor regulation. *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 515, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).

Similarly, Supreme Court jurisprudence in this area generally counsels that the State's interest in controlling adverse secondary effects is important and substantial, and that it should be viewed as "unrelated to the suppression of free expression." *See Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 1562 n. 2, 155 L.Ed.2d 535 (2003), citing *Renton,* 475 U.S. at 48, 106 S.Ct. 925. *But see Alameda Books,* 535 U.S. at 453, 122 S.Ct. 1728 (Souter, J., dissenting)(questioning intermediate scrutiny for regulations "not uniformly distinct from the content-based regulations calling for scrutiny that is strict"); *Barnes,* 501 U.S. at 587, 111 S.Ct. 2456 (White, J., dissenting)(disputing analysis under *O'Brien;* finding nudity itself expressive, rather than merely incidental "conduct"). New Rule 52 therefore appears to satisfy the second and third prongs of the *O'Brien* test.

With regard to the fourth prong, this Court previously held that the plaintiffs could not demonstrate a substantial likelihood of success (except on a catch-all provision, § (B)(7), since removed from the Rule). *Spoons II,* 190 F.R.D. at 439–40. As the Court will discuss *infra,* it is possible that some of the new restrictions, *e.g.* those on exposure of the buttocks, or the wearing of a costume simulating nudity, burden the plaintiffs' ability to communi-

cate their message of eroticism more substantially than the Constitution allows. This possibility is mitigated somewhat by the Supreme Court's ruling in *City of Erie,* which found similar language regarding costumes and opaque coverings to be an incidental restriction on First Amendment freedoms no greater than that essential to furtherance of the state's interest [10].

The Court acknowledges, however, that the club owners might establish a strong likelihood of success on the merits of their as-applied challenge if they could show that *no* restriction of their First Amendment rights is "essential to the furtherance" of the State's interest—*i.e.,* if they could thoroughly refute the State's claims that prohibitions on nudity in alcohol-serving establishments somehow serves to reduce crime in the vicinity of those establishments. Clearly, the studies and testimony of Dr. Linz were presented to the Court in service of this goal.

Yet the Court also notes that the Supreme Court has advocated great deference to state and city governments in this area. In *Alameda Books,* Justice Kennedy reiterated that, in zoning to reduce secondary effects, "a city must have latitude to experiment, at least at the outset, and . . . very little evidence is required." 535 U.S. at 451, 122 S.Ct. 1728, citing *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. [I]f [the city's] inferences appear reasonable, we should not say there is no basis for its conclusion." *Id.* at 451–52, 122 S.Ct. 1728. Applying these principles, Justice Kennedy approved of Los Ange-

---

**10.** It bears noting, however, that the Court in *City of Erie* appeared to rely on an interpretation by the Pennsylvania Supreme Court in reading the "opaque covering" language to require only the wearing of pasties and G-strings. No such limiting construction is available to the Court in this matter.

les's reliance on "a single study and common experience." *Id.*

Here, the State has offered personal experience in the form of testimony by Scott Pohlman of the Ohio Department of Public Safety, who spoke at length on the types of abuses he has witnessed in liquor-serving establishments that feature nude or semi-nude dancing (Transcript of March 12 Hearing, at 88–102), and Bruce Taylor, who both testified before the Liquor Control Commission on his experiences as a prosecutor, and offered affidavits and other documentary evidence on the links between sex and drug offenses, prostitution, and adult cabarets. Assuming the State did in fact rely on this evidence in making its decision to enact new Rule 52, the club owners may have difficulty persuading the Court that the Commission's procedures were any more methodologically unsound than those followed by the City of Los Angeles.

Even greater uncertainty is sure to attend any attempt to evaluate the more empirical evidence presented by the parties. To paraphrase Justice Kennedy, the State's "single study" in this case appears to be one conducted by the Sheriff's office of Adams County, Colorado, and it must be contrasted with the thorough investigation of crime rates (and contributing factors to the crime rates) undertaken by Dr. Linz in and around four major Ohio cities.

Dr. Linz's study shows a lack of correlation between the presence of liquor-serv-ing establishments featuring nude or semi-nude dancing and the types of crime the State seeks to reduce. (*See* Transcript of March 12 Hearing, at 25–56). In Toledo, Dr. Linz's hierarchical regression analysis revealed that the presence or absence of adult cabarets in a given neighborhood did approximately nothing to explain the presence of crime in that same neighborhood. Transcript of March 12 Hearing at 39, 45–46. Similarly, in Columbus, the addition of "alcohol-serving adult cabarets" as a factor in Dr. Linz's analysis resulted in approximately "zero explanatory power." Transcript of March 12 Hearing at 46. In Dayton, Dr. Linz's work revealed a *negative* correlation between adult cabarets and incidents of rape, such that "the presence of [an alcohol-serving adult entertainment] establishment is actually indicative of less rather than more rape events." Transcript of March 12 Hearing at 52. Finally, in Cleveland, Dr. Linz found that the addition of "alcohol-serving adult cabarets" as a factor in his analysis also added "no ability to [explain] crime incidents." Transcript of March 12 Hearing at 54.

The Court is uncertain to what extent the Supreme Court would advocate that we simply approve the State's reliance on "propositions ... well established in common experience and ... zoning policies that we have already examined," *Alameda Books,* 535 U.S. at 453, 122 S.Ct. 1728, and ignore the implications of more persuasive, if counterintuitive, evidence like Dr. Linz's study[11]. Clearer guidance in this area

11. Dr. Linz suggested that the negative correlation between adult establishments and violent crime March 28, 2004 might be explained by the fact that

in alcohol serving establishments that do not feature adult entertainment, people fight with one another particularly men over women. They fight about a person looking at my girlfriend ... my girlfriend looking at you, you standing too close to my girlfriend, you making eyes at my girlfriend. None of that exists in an adult entertain-ment venue. There is no opportunity to fight over the women because the women in terms of entertainment, expression of ideas about sexuality and eroticism are available for public consumption. There's no need to hassle, tussle, or fight over dates or over one person encroaching on the territory of another, which are the reason that most men fight in bars and parking lots of bars. All of that is removed in an adult location.

Transcript of March 12 Hearing at 50.

would greatly aid the Court in determining whether the club owners have established a strong likelihood of success on a claim that no restriction on nudity could possibly further the State's interest in reducing secondary effects.

However, the Court need not finally resolve the as-applied issue at this juncture. An injunction must issue because the club owners have shown a strong likelihood of success on their claim that the challenged sections of Rule 52 are unconstitutionally overbroad, and because they are likely to suffer irreparable harm in the absence of injunctive relief.

### b. The Facial Challenge

■ First it should be noted that neither *Alameda Books*—in which the Supreme Court examined a zoning regulation—nor *City of Erie* involved a challenge similar to that raised here by the club owners, namely that Rule 52 is unconstitutional on its face, because the challenged sections are overbroad.[12]

The constitutional landscape in this area is therefore dominated by *Triplett Grille,* which provided the foundation for much of the Court's previous ruling on Rule 52, and which continues to state the Sixth Circuit's interpretation of the law on overbreadth. A comparison of the new provisions of Rule 52 to those previously invalidated reveals the new language to be no more constitutionally sound under the mandate of *Triplett Grille.* The Court therefore finds it probable that the plaintiffs will prevail on their argument that the challenged sections are overbroad.

This Court has summarized the applicable law as follows:

A government regulation is facially overbroad when there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). To be unconstitutionally overbroad, a regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The plaintiffs' overbreadth challenge is controlled by the Sixth Circuit's decision in *Triplett Grille.* In that case, the Sixth Circuit invalidated on overbreadth grounds an Akron ordinance that prohibited public displays of nudity and sexual conduct. *See Triplett Grille,* 40 F.3d at 135–36. The court reasoned as follows:

The Akron public indecency ordinance at issue here prohibits all public nudity, including live performances with serious literary, artistic, or political value. The ordinance makes no attempt to regulate only those expressive activities associated with harmful secondary effects and includes no limiting provisions. Instead, Akron's wide ban on public nudity sweeps within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes. *Id.* at 136. The Sixth Circuit noted that in *Barnes,* when indicating that there was no overbreadth claim before the Supreme Court, Justice Souter had observed that "[i]t is difficult to see ... how the enforcement of Indiana's statute against nudity in a production of 'Hair' and 'Equus' somewhere other than an

---

12. In fact, Justice O'Connor's opinion in *City of Erie* explicitly noted that, following the approach taken by the Pennsylvania Supreme Court, the Court "did not address ... the claim that the ordinance is unconstitutionally overbroad." 529 U.S. at 286, 120 S.Ct. 1382.

'adult' theater would further the State's interest in avoiding harmful secondary effects ...." *Barnes*, 501 U.S. at 585 n. 2, 111 S.Ct. 2456 (Souter, J., concurring); *Triplett Grille*, 40 F.3d at 136. Because the Akron ordinance in *Triplett Grille* covered artistic performances as well as adult entertainment, the Sixth Circuit found the ordinance to be overbroad in violation of the First Amendment. *Triplett Grille*, 40 F.3d at 135–36.

*Spoons II*, 190 F.R.D. at 441. The underpinnings of this analysis have not changed. The Court may therefore reasonably begin its examination by inquiring: what has changed about Rule 52?

### i. Sections on "Lewd Activities"

The Commission has entirely removed the portions of Rule 52 dealing with the "simulation" of a variety of sexual behavior, and the showing of "electronically reproduced" images containing actual or simulated sexual activities. The Court, citing *Triplett Grille*, had previously held that these sections impermissibly curtailed a substantial amount of protected speech.

### ii. Sections on Appearing in a State of Nudity

The Commission has replaced its prior definition of nudity with Section (B)(3) of Rule 52:

"Nudity" means the showing of the human male or female genital, pubic area or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque

covering of any part of the nipple and/or areola; the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft, perineum, anal region, or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of the nipples and/or areola.

This definition is even broader than the version found by this Court to reach a substantial amount of protected conduct. The only language removed by the Commission is that regarding electronic reproductions, and a phrase regarding the appearance of the covered male genitals in a "discernibly turgid state."

Contrarily, Section (B)(3) now includes additional restrictions on nudity-simulating "devices, costumes, or coverings," a phrase which expands the applicability of the Rule to include a variety of non-nude entertainment.

The relevant question remains whether the regulation "reaches a substantial amount of constitutionally protected conduct," such that it threatens to chill the exercise of protected expressive activity. *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *see also Southwest Ohio Reg'l Transit Auth.*, 163 F.3d at 361. The plaintiffs in this case have demonstrated that §§ (A)(3) and (B)(2) reach a substantial amount of protected conduct.[13]

The Court previously noted:

---

13. As the Court previously noted:

Considering the prevalence of liquor permits, and the dearth of evidence that harmful secondary effects are associated with anything other than adult entertainment businesses, there is no reason to force theaters, comedy clubs, and similar establishments to choose between possessing liquor permits or presenting performances that

might fall within the proscriptions of Rule 52. The fact that *Hair* may be presented at a venue without a liquor permit is of limited significance when the plaintiffs have shown that, in fact, many major entertainment venues possess liquor permits that cover performance areas.

*Spoons II*, 190 F.R.D. at 442 n. 11.

A variety of artistic performances, including the oft-cited *Hair* and *Equus* as well as smaller productions like Karen Finley's one-woman shows, are constitutionally protected and involve nudity. Yet Rule 52 makes no exception for such artistic performances. When a regulation sweeps in performances that fall outside the rubric of adult entertainment, the regulation is vulnerable to an overbreadth attack.

*Spoons II*, 190 F.R.D. at 442, citing *Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998), *Triplett Grille*, 40 F.3d at 135–36. New Rule 52 continues to make no exception for artistic performances, and therefore continues to sweep in performances that fall outside the rubric of adult entertainment, and to reach a substantial amount of constitutionally protected conduct.

Testifying at the March 11 evidentiary hearing, Dr. Hanna brought to the Court's attention numerous examples of mainstream theater and dance which contain nudity and/or sexual contact as prohibited by Rule 52. These included *Prodigal Son*, Paul Taylor's *Big Bertha*, *Mutations*, and the recent off-Broadway hit *Puppetry of the Penis*. *See* Transcript of March 11 Hearing, at 24–30. Touring productions of *O Calcutta!* would continue to be at risk under this version of the rule, as would a man dropping his pants as part of a comedy routine. The State acknowledges as much (though, it claims, the Rule applies "only if the man is completely bereft of the most minimal underwear when he drops his pants").[14]

The Court attaches no significance to the State's promise that "enforcement . . .

will continue solely against the type of establishment generally associated with negative secondary effects," given the Sixth Circuit's reminder that courts need "not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights." *United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir.1998). In fact, the State's good faith on this score is explicitly contradicted by the history of Rule 52, which reveals the commencement of a prosecution against *O Calcutta!* Transcript of March 12 Hearing at 104–05.

Indeed, were Rule 52 to be found constitutional, the State has acknowledged that it would be *obligated* under ORC § 5502.02 to enforce the Rule against any and all liquor permit holders in Ohio. *See* Transcript of March 12 Hearing at 111–13; Plaintiff's Exhibit 17. Permit holders to whom the State's restrictions on nudity and "sexual conduct" would apply include Jacobs Field, Gund Arena, the Beachland Ballroom, Great Lakes Science Center, Akron Civic Theater, Cain Park Amphitheater, the Cleveland Museum of Art, and each of the theaters operated by the Playhouse Square Foundation. Transcript of March 12 Hearing at 115–19.

If enforced, Rule 52 risks suppression of a significant quantum of protected expression at these and many other venues, all of which present the types of performances described by Dr. Hanna as well within the mainstream of American artistic entertainment. This risk is only amplified by new language in the Rule prohibiting nudity-simulating costumes, which as Dr. Hanna

---

**14.** It is difficult to adequately express the extent to which this attempt at reassurance by the State misses the point. The comedic value of any hypothetical pants-dropping bit would be entirely removed if the comedian were required to wear underwear—*especially* if said underwear could not "simulate the appearance of" the nudity sought to provoke a laugh. Without said comedic value, the comedian's ability to convey his message would be utterly impaired.

testified could include the body suits and leotards worn by ballet and modern dancers and even cheerleaders. Transcript of March 11 Hearing at 31–32.

To advance its substantial interest in the reduction of adverse secondary effects, the State may prevent erotic dancers from appearing totally nude. However, in so doing, the State may not curtail a substantial amount of protected expression outside the realm of adult entertainment. *Triplett Grille,* 40 F.3d at 136. By substituting broader language covering non-nude performances, and by failing to in any way address the Court's clearly articulated concern for exempting mainstream artistic performances, the State appears to reach well beyond the realm of speech reasonably associated with the secondary effects it seeks to curtail. The Constitution does not countenance such overreaching, and the club owners are therefore likely to prevail on their claim that Sections (A)(3) and (B)(2) of Rule 52 are unconstitutionally overbroad.

### iii. Sections on Sexual Activity

The Commission has replaced its prohibition on touching, fondling, or caressing the genitals, pubic area, buttocks, or female breasts of any person with new Section (B)(3), comprising the following language: "no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to [e]ngage in sexual activity as said term is defined in ORC Chapter 2907." "Sexual Activity" is defined by Ohio Revised Code Chapter 2907 as "sexual conduct or sexual contact, or both."

> "Sexual conduct," in turn, is defined as: vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, appara-

> tus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

And "sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

Once again, the new language easily lends itself to even broader interpretation and application than that previously declared unconstitutional by this Court. Because the State still has not seen fit to include an exception for artistic performance, Section (B)(3) continues to carry a risk of enforcement against ballet and modern dance performances, in which participants are frequently required to "touch" the "erogenous zones" of one another. As Dr. Hanna explained, the requirement that such touching be "for the purpose of sexually arousing or gratifying" does not constitute a substantial limitation on the Section. *See* Transcript of March 11 Hearing, at 34–35. In fact, one might easily posit a nearly unlimited number of contexts in which performers undertaking clearly protected forms of expression might seek to convey a message via the "gratifying" "touching of an erogenous zone of another, including without limitation the thigh."

Perhaps even more troubling is the position into which new Section (B)(3) forces permitholders with regard to their patrons. Under a reasonable reading of the Rule, a bar owner who witnesses patrons flirtatiously touching one another, on any potentially "erogenous" part of the body, including *without limitation* the thigh, must take an affirmative step to end this conduct. Under such circumstances, the owner would be forced to choose between

losing his liquor license or infringing on his patrons' freedom of association.

Although the removal of language specifically prohibiting self-touching might assuage the Court's stated concern for Michael Jackson's "famous groin-grabbing dance move," *Spoons II*, 190 F.R.D. at 443, the State has substituted language which is in many ways more clearly unconstitutional, allowing as it does the suppression of the wide variety of messages which require pleasurable touching of some sort for their communication.[15]

Again, *Triplett Grille* continues to state the law in this Circuit regarding overbreadth, and Section (B)(3) new Rule 52 is in many ways *even broader* than its predecessor, seeking as it does to prohibit all manner of pleasurable touching in liquor-serving establishments, simply by reference to the ambiguous phrase "erogenous zones." As in *Triplett Grille*, "The ordinance makes no attempt to regulate only those expressive activities associated with harmful secondary effects and includes no limiting provisions. Instead, [it] sweeps within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes." 40 F.3d at 136. Thus the Court finds that the club owners have shown a strong likelihood of success on their facial challenge to this provision.

### iv. Catch–All Provision

The Commission has removed prior Section (B)(7), on committing "improper conduct of any kind, type, or character that would offend the public's sense of decency, sobriety or good order." The Court previously enjoined these provisions as likely to be found unconstitutional as applied.

Given the likely overbreadth of the above sections, this removal is insufficient to salvage the constitutionality of Rule 52.

### 2. Threat of Irreparable Harm to the Plaintiff

■ As explained above, the club owners are likely to prevail on their overbreadth challenge. The denial of constitutional rights has been held by numerous federal courts, including the Supreme Court, to constitute irreparable harm. Specifically, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It follows, as a matter of law, that the plaintiffs will suffer irreparable harm if the State and its agents are not enjoined from enforcing the challenged sections of Rule 52.

### 3. Threat of Substantial Harm to the Defendants

This Court does not find that the State will suffer any appreciable amount of harm if it is enjoined from enforcing the pertinent sections of Rule 52. Therefore, the third factor considered regarding the issuance of a preliminary injunction favors the club owners.

### 4. Whether Injunctive Relief would Serve the Public Interest

Finally, it is in the public interest to prevent the enforcement of unconstitutional laws, and thereby uphold constitutional

---

**15.** In the previous action, the Court expressed concern over the applicability of language prohibiting self-touching to baseball players adjusting their equipment following a play. *Spoons II*, 190 F.R.D. at 443, n. 13. The substituted language no longer risks chilling this type of behavior, but might arguably apply to the ubiquitous butt-pats administered by athletes to one another, for the purposes of encouragement and positive reinforcement, if not "gratification."

rights. Therefore, the fourth factor this Court must balance supports the issuance of a preliminary injunction.

## B. The Motion to Find the State in Contempt

Both parties presented argument at the March 11 and 12 hearing on the availability of a contempt sanction against the State, for violation of the Court's previous order. Plaintiffs argue that such a sanction is appropriate because "the definition of nudity in the new regulation contains provisions which are in all material respects identical to those invalidated by this Court on July 5, 2000." The State counters that the new Rule is substantially different, and that it was enacted pursuant to valid procedures.

The validity of the State's procedures for enactment does not appear to be in doubt. What the Court must decide is whether, given a finding that the new Rule is unconstitutional, its similarity to the former Rule 52 would justify a finding that the State disregarded the prior mandate.

■ The club owners are correct that a finding of contempt is appropriate if the Court finds that the State "failed to take all reasonable steps within [its] power to comply with the court's order." *Harrison v. Metropolitan Gov't of Nashville & Davidson County, Tenn.,* 80 F.3d 1107, 1112 (6th Cir.), *cert. denied,* 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996). "There is no requirement of willfulness to establish civil contempt, and the intent of a party to disobey a court order is irrelevant to the validity of a contempt finding." *Nettis Environmental, Ltd. v. IWI, Inc.,* 46 F.Supp.2d 722, 726 (N.D.Ohio 1999), quoting *Rolex Watch U.S.A. v. Crowley,* 74

F.3d 716, 720 (6th Cir.1996); *In re Jaques,* 761 F.2d 302, 306 (6th Cir.1985).

■ The burden rests on the party seeking a contempt finding to establish violation of the previous order by clear and convincing evidence. *Glover v. Johnson,* 934 F.2d 703, 707 (6th Cir.1991), citing *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir.1987). The club owners cannot carry this burden. The State has issued no citations and commenced no action under Rule 52 since this Court's last ruling. Transcript of March 12 Hearing at 104. And there is no evidence before the Court suggesting that agents of the State sought to prosecute violations of *former* Rule 52 on February 20. Finally, the club owners have cited, and the Court could locate, no case in which a state government was held in contempt under similar circumstances.

Indeed, it would be difficult to conceive of any fashion in which the State might comply with a court order enjoining one of its regulations, except to refrain from enforcing the regulation, and to attempt to enact a more constitutionally acceptable substitute. This is what the State appears to have done here [16]. However short of the constitutional mark its efforts might have fallen, a finding of contempt is not justified.

Therefore, the Court denies the plaintiff's motion for an order to show cause why the defendants should not be held in contempt.

## C. Scope of the Preliminary Injunction

Once more, the Court finds it impossible to sever the language likely be found un-

---

16. In fact, the Court takes the plethora of references to "Judge Aldrich" in the transcript of proceedings before the Liquor Control Commission as evidence (however circumstantial) of the State's efforts to comply with the previous ruling, and to avoid a similar ruling in the future.

constitutional from the specific subsections in which that language is contained. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 202 (6th Cir.1997), *cert. denied*, 523 U.S. 1036, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998) (under Ohio law, severance may not fundamentally disrupt the statutory scheme or require the insertion of additional words). However, it is appropriate to limit the injunction to the challenged sections of the Rule. *See id.* Thus, this Court may enjoin Sections (A)(2), (B)(2), and (B)(3) without altering the meaning of, or otherwise disrupting, the remaining portions of Rule 52.

Additionally, the Court agrees with the club owners that an injunction issued by this Court prohibits any enforcement of the challenged sections of Rule 52 by officers of the state of Ohio statewide. The club owners' overbreadth claim allows them to assert the First Amendment rights of parties not before the Court; the Court's entry of an injunction therefore means that "any enforcement [of the challenged sections] is totally forbidden." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

### III.  Conclusion

For the foregoing reasons, this Court denies the plaintiffs' motion for a finding of contempt, grants the plaintiffs' motion for a preliminary injunction, and enjoins the defendants from enforcing Sections (A)(2), (B)(2), and (B)(3) of Rule 52 anywhere in the state of Ohio.

A status call will be scheduled separately for purposes of determining whether any additional proceedings are necessary to reach a final decision on the merits.

IT IS SO ORDERED.